## City of St. Paul vs. Frank Smith.

### December 27, 1880.

**City Ordinance regulating Hacks at Railroad Stations.**—The charter of the city of St. Paul authorizes the common council, by ordinances, " to regulate, and at a reasonable rate to license, hacks, carts, omnibuses, trucks, wagons, and other vehicles engaged in hauling or carrying for hire, and the charges of the drivers of such vehicles." *Held,* that the following ordinances are authorized by this provision of the charter, viz.: Ordinance 107, which provides "that hackmen, * * * when at or about any railroad depot or station, * * * shall obey the commands and directions of the police officer or officers who may be stationed or doing duty at or about such depot or station * * * for the preservation of order and enforcement of ordinances;" and ordinance No. 133, which provides that "no owner or driver of any * * * hack * * * shall make any stand or stopping-place, with or without his vehicle, while waiting for employment at any place on any street or public ground adjacent to any railroad or railway depot, * * * except in the place or places designated by the police officer on duty, from time to time, at such railway depot or station." *Held,* that these ordinances are regulations of hacks, and not unreasonable or oppressive; also, that ordinance No. 133 authorizes the assigning of a particular place to each hackman; also, that the fact that the ground about the depots or stations where these ordinances are to be enforced is not the property of the city, or public property of any kind, strictly speaking, is not important. The fact that it is commonly used by hackmen for the purposes mentioned in the ordinances is sufficient.

*Certiorari* to the municipal court of St. Paul, where the defendant was convicted and fined for a violation of the ordinances mentioned in the opinion.

*W. P. Murray*, for plaintiff.

*S. L. Pierce*, for defendant.

BERRY, J.   Subdivision 11, subchapter 4, of the city charter of St. Paul, (Sp. Laws 1874, *c.* 1,) authorizes the common council, by ordinances, resolutions, or by-laws, "to regulate, and at a reasonable rate to license, hacks, carts, omnibuses, trucks, wagons, and other vehicles engaged in hauling or carrying for hire, and the charges of the drivers of such vehicles." Under this authority the common council passed two ordinances, Nos. 107 and 133.   No. 107 provides "that hackmen, * * * when at or about any railroad depot or station, * * * shall obey the command and directions of the police officer or officers who may be stationed or doing duty at or about such depot or station * * * for the preservation of order, and enforcement of ordinances."   No. 133 provides that "no owner or driver of any * * * hack * * * shall make any stand or stopping-place, with or without his vehicle, while waiting for employment at any place on any street or public ground adjacent to any railroad or railway depot, * * * except in the place or places designated by the police officer on duty, from time to time, at such railway depot or station."   These provisions of the ordinances named were, in our opinion, authorized by the charter provision above quoted, giving authority, among other things, to regulate hacks.   That they are *regulations* of hacks is apparent, and in our opinion they are not unreasonable or oppressive.   It is a matter of common knowledge that at and about the hours of the arrival and departure of passenger trains, confusion and disorderly brawling and breaches of the peace are very apt to occur at and about depots and stations in considerable towns, especially among those who are engaged in carrying passengers and baggage to and from such depots and stations.   The only efficient preventive or remedy in the premises appears to be to put a police officer upon the spot, whose duty it shall be to enforce such applicable ordinances as the city council, in the exer-

cise of chartered power, may have seen fit to adopt. This seems to be the general if not universal practice in all large cities and towns. As it is manifestly impracticable and impossible to define minutely every case of disorder or confusion, it is proper—in fact, it is necessary—that the officer on duty should be invested with some general authority to preserve order, and thus determine on the emergency what acts are disorderly or likely to lead to disorder, though, of course, this authority would not justify him in arbitrary or unreasonable action. Upon these grounds we think the ordinances in question valid and justifiable. The assigning of a particular place to each hackman would appear to be peculiarly and happily adapted to the preservation of order. By this practice every one is informed exactly where his proper place is, so that the strife and contention for particular places which would otherwise ensue is measurably, at any rate, prevented. The authority thus to assign places must necessarily be committed to some officer, and for obvious reasons it is very properly committed to the policeman on duty at the depot or station. As in the other case mentioned, this authority should, of course, be exercised with fairness to all concerned. The fact that the ground about the depots or stations where these ordinances are to be enforced is not the property of the city, or public property of any kind, strictly speaking, is not important. The fact that it is commonly used by hackmen in their business, for the purposes mentioned in the ordinances, is sufficient.

Judgment affirmed.