STATE OF MISSOURI EX REL. W. J. RUSSELL, Respondent, *v.* JOHN BEATTIE, Appellant.

June 24, 1884.

1. MUNICIPAL CORPORATIONS — POLICE POWER — NUISANCE. — The charter of the city of St. Louis authorizes the regulation of livery stables, the designation of the places where, in future, they may be erected, and the prohibition of their erection at other places.

2. —— ORDINANCES. — An ordinance prohibiting the erection of a livery stable on any block of the city without the consent of the owners of one-half of the ground in any such block, is not an unreasonable exercise of the charter power. (THOMPSON, J., dissenting.)

APPEAL from the St. Louis Circuit Court, THAYER, J. *Reversed and judgment.*

HENRY HITCHCOCK, for the appellant.

JOHNSON, LODGE & JOHNSON and E. J. O'BRIEN, for the respondent.

THOMPSON, J., delivered the opinion of the court.

The case on behalf of the appellant has been ably presented, but we have not had the benefit of any argument or brief on behalf of the respondent. We have,

nevertheless to decide as best we can, a question involving very considerable public interest.

The defendant was, at the time when this suit was prosecuted in the circuit court, the commissioner of public buildings of the city of St. Louis. In virtue of his office it was, under an ordinance of the city, his duty to grant permits for the erection of private buildings within the city. The plaintiff made an application to the defendant for a permit to erect a building in a certain block in the city, to be used as a livery stable. The defendant refused to issue such permit, and justified his refusal under the following ordinance:—

" An ordinance regulating the location of livery, boarding and sale stables.

" Be it ordained by the Municipal Assembly of the city of St. Louis, as follows:

" Section 1. Hereafter no livery, boarding, or sales stables shall be located on any block of ground in St. Louis without the written consent of the owners of one-half the ground of said block.

" Sect. 2. No permit shall hereafter be granted by the commissioner of public buildings for the erection of any livery, boarding, or sales stables until the foregoing provision is complied with, and the written consent aforesaid is filed in said office.

" Sect. 3. Any person maintaining a livery, boarding, or sales stable contrary to section one of this ordinance shall be guilty of a misdemeanor, and shall be fined not less than ten dollars nor more than two hundred dollars for each offence, and each day said stable is maintained as aforesaid shall constitute a separate offence.

" Sect. 4. There being no ordinance upon the subject-matter of this ordinance, it is deemed that an emergency exists, and hence this ordinance shall take full effect from and after its passage.

" Approved Nov. 22, 1882."

The plaintiff thereupon instituted the present proceeding in the circuit court for a *mandamus* to compel the defendant to issue such permit. At the hearing in the circuit court a peremptory *mandamus* was awarded, and the defendant has appealed.

The only question which arises upon this record is whether this ordinance is a valid exercise of the powers conferred upon the city of St. Louis by its charter.

The validity of the ordinance is asserted by the defendant under three separate grants of power in the charter: 1. The power to regulate livery and sales stables. 2. The power to declare and prevent nuisances on public or private property, *and the causes thereof.* 3. The power conferred by what is known as the " general welfare clause " of the charter. Charter of St. Louis, art. III, sect. 26, sub-sects. 5, 6, and 14.

I. The first of these powers is conferred by section 26 of the charter in the following language: " The mayor and assembly shall have power within the city, by ordinance not inconsistent with the constitution or any law of this state, or of this charter. * * Fifth. To license, tax and regulate lawyers, doctors and doctresses, undertakers, dentists, auctioneers, grocers, merchants, retailers, hotels, boarding-houses, tenement-houses, office buildings, public buildings, public halls, public grounds, concerts, photographists, artists, agents, porters, runners, drummers, public lecturers, public meetings and shows, real estate agents and brokers, financial agents and brokers, horse and cattle dealers, patent right dealers, inspectors and gaugers, stock yard proprietors, examiners of titles, conveyancers, mercantile agents, insurance companies, and insurance agents, bankers, banking or other corporations or institutions, telegraph companies or corporations, street railroad cars, *livery and sale stables* hackney carriages, private carriages, barouches, buggies, wagons, omnibuses, carts, drays, and other vehicles, and all other business,

trades, avocations, or professions whatever." 2 Rev. Stats. 1585, 1586.

This grant of power seems to be large enough to confer upon the mayor and municipal assembly the right to determine the *place where* livery and sales stables shall be located, as well as the *manner in which* the business of keeping them shall be carried ·on. A rule of interpretation which would restrict the meaning of the word regulate to the latter sense, would seem to be much too narrow. It has been recently held by the court of appeals of New York that an ordinance giving the power " to regulate the erection, establishment and continuance of slaughter-houses," confers upon the legislative authorities of the city the right to prescribe the *places* where the business of slaughtering animals shall alone be carried on. An ordinance restricting the erection of slaughter-houses to a certain portion of the city was held to be not only within this grant of power, but not void as being in restraint of trade; nor would it be presumed that the legislative authority of the city would exert this power in such a manner as absolutely to prohibit the slaughtering of animals within the city. Should this be done, the court reasoned that it would be time to consider the validity of such an ordinance when the question should arise. *Cronin* v. *The People*, 82 N. Y. 318. So, an ordinance providing that meat should not be sold except in a particular place within the village limits, was held good, the same not being in restraint of the right of sale, but merely a regulation thereof. *Village of Buffalo* v. *Webster*, 10 Wend. 99, 101. So, under a power to " regulate hacks," etc., it has been held that an ordinance which requires hacks when at railway depots to stand in a place to be designated by the police officer there on duty, is a valid and reasonable exercise of power, the court saying : " That they are regulations of hacks is apparent ; and in our opinion they are not unreasonable and oppressive." *St. Paul* v. *Smith*, 27 Minn. 364.

But the decisions of our own supreme court seem to furnish controlling authority upon this question. The vending to the inhabitants of the city of meat, poultry, and vegetables is even more necessary to the subsistence, health, and welfare of such inhabitants than the hiring of horses and vehicles to them for use on errands of business or pleasure ; it is certainly a right of as high a character as the latter, and its unrestrained exercise may not be more prejudicial to the public health or comfort. But it was held by our supreme court as early as 1857, that a clause in the charter of the city of St. Louis, giving the mayor and city council the power " to regulate the inspection of butter, lard, and other provisions ; to regulate the vending of meat, poultry, and vegetables ; to restrain and punish the forestalling of poultry, butter, eggs, and fruit, and to suppress hucksters," confers upon them power to provide by ordinance that " no person, not being the lessee of a butcher stall, shall sell or offer for sale in market, or in *any other place*, any fresh meat in less quantities than one quarter." *City of St. Louis* v. *Jackson*, 25 Mo. 37. Such an ordinance, it has been held, is not in restraint of trade, but is both politic and proper. In giving the opinion of the court, Ryland, J., said : " This ordinance is not against any known law of our state, nor does it interfere with the right of selling the commodities of our citizens; it requires that the person retailing fresh meat shall have a stall in some market for that purpose. The city undergoes heavy expense in erecting commodious and convenient market-houses ; it rents the stalls of those houses to butchers and others retailing fresh meats ; the rents are of importance by way of income to the city. Now, to permit any one who may think proper to put up a block or shanty on any street or alley for the purpose of selling fresh meats in quantity less than a quarter, and thereby withdraw the purchasers from the market-houses, is at once giving to such retailers a very great

advantage over those who rent the stalls and pay a high price for them." *Ibid.* 41.

This decision was reaffirmed in *City of St. Louis* v. *Weber* (44 Mo. 547), under a charter provision somewhat different in phraseology but similar in substance, and the authority of contrary decisions in other states. *St. Paul* v. *Laidlow* (2 Minn. 190), and *Bethune* v. *Hughes* (28 Ga. 560), was distinctly denied. Judge Bliss, in closing his opinion, said : " The power thus to regulate is not only sustained by *Jackson* v. *The City of St. Louis*, but by many authorities in other states. *Ash* v. *The People*, 11 Mich. 347 ; *Davenport* v. *Kelley*, 7 Iowa, 102 ; *Bush* v. *Seabury*, 8 Johns. 418 ; *Buffalo* v. *Webster*, 10 Wend. 99."

The power to regulate in cities the carrying on of trades which are necessary to the welfare of the inhabitants of such cities, and which must hence be carried on somewhere within the limits of such cities, but which trades, unless carried on in particular places, or in one place, where the manner of carrying them on can be made the subject of a practical system of public inspection, by prescribing the place or places in which alone such trades should be carried on, does not infringe any right guaranteed by the constitution and laws of this state, or by the constitution of the United States. The power thus to regulate is a part of that necessarily extensive and undefined power which resides in every government, called the police power. " Unwholesome trades, slaughter-houses, operations offensive to the senses, the deposit of powder, the application of steam power to propel cars, building with combustible materials, and the burying of the dead, may well," says Chancellor Kent, " be interdicted by law in the 'midst of dense masses of population, on the general and rational principle that every person ought so to use his property as not to injure his neighbor; and that private interests must be made subservient to the general interests of the community." " This,"

said Mr. Justice Miller, referring to this language of Chancellor Kent, "is called the police power, and it is declared by Chief Justice Shaw (*The Commonwealth* v. *Alger*, 7 Cush. 84), that it is much easier to perceive and realize the existence and source of it than to mark its boundaries or to prescribe limits to its exercise. This power is and must be, from its very nature, incapable of any exact definition or limitation. Upon it depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property." *Slaughter-house Cases*, 16 Wall. 36, 62. "It extends to the protection of the lives, limbs, comfort, and quiet of all persons, and the protection of all property, within the city ; * * * persons and property are subject to all kinds of restraint and operations in order to secure the general comfort, health and prosperity of the state. Of the perfect right of the legislature to do this, no question ever was, or, upon acknowledged general principles, ever can be, made, so far as natural persons are concerned." *Thorpe* v. *Rutland & Burlington Ry. Co.*, 27 Vt. 146. Quoting this language, it was further said by Mr. Justice Miller, speaking for the court in the *Slaughter-house Cases:* "Regulations of the place and manner of conducting the slaughtering of animals and the business of butchering within the city, and the inspection of the animals to be killed for meat, and of the meats afterwards, are among the most necessary and frequent exercises of this power. It is not, therefore, needed that we should seek for a comprehensive definition, but rather look for the proper source of its exercise." 16 Wall. 63. In this very important case, a statute of Louisiana which created a corporation called an abattoir company, and which required all the slaughtering of animals within the city to be done on the premises of such corporation, was upheld as a valid exercise of the police power, and was

held not to be within the inhibitions of the fourteenth amendment to the federal constitution.

We, therefore, do not doubt that it is competent for the mayor and municipal assembly, under the power given in the charter, to regulate livery stables, to prescribe not only the manner in which a livery stable shall be kept and cleansed, but also to confine the keeping of such stables to certain places in the city, if, in their judgment, the health, comfort, and welfare of the inhabitants require such a regulation.

II. The same section of the charter of the city of St. Louis prescribes that "the mayor and assembly shall have power within the city, by ordinance not inconsistent with the constitution or any law of this State or of this charter: * * * Sixth. To establish and enforce quarantine laws and regulations to prevent the introduction and spread of contagious diseases; to establish and regulate hospitals, and to secure the general health of the inhabitants by any measure necessary; to regulate stone quarries and quarrying of stone, and the slaughtering of animals; provide for the erection, management and regulation of slaughter-houses; prevent the driving of stock through the city; prohibit the erection of soap factories, stock-yards and slaughter-houses, pig-pens, cow-stables and dairies, coal oil and vitriol factories within prescribed limits, and to remove and regulate the same; and to regulate or prevent the carrying on of any business which may be dangerous or detrimental to the public health, or the manufacture or vending of articles obnoxious to the health of the inhabitants; and *to declare, prevent, and abate nuisances on public or private property and the causes thereof;* and the mayor, whenever, in his opinion, a nuisance exists on public or private property, or whenever a nuisance has been so declared by ordinance or resolution of the board of health, is authorized to abate and remove such nuisance and the cause thereof in a sum-

mary manner, at the cost of the owner or occupant of the premises where the nuisance or the cause thereof may be, and for that purpose may enter upon and take possession of any premises or property where such nuisance may exist or be produced." 2 Rev. Stats. 1586.

The power to pass the ordinance in question is claimed to exist under that clause of the above grant of power which confers upon the mayor and municipal assembly the power " to declare, prevent, and abate nuisances on public or private property, and the causes thereof." In considering this grant of power in the application here contended for, it has been thought best not to consider it as an isolated clause, but in connection with the other powers granted in the same sub-division, which seem to have for their object the preservation of the public health and safety. The effort of the draftsman of this clause seems to have been to frame the sub-division so as to confer upon the mayor and municipal assembly the largest possible powers to accomplish the intended ends, which were deemed consistent with the constitution and laws of the state. So far as this sub-division undertakes to *define*, it is to be observed that it says nothing of livery stables. It confers the power to *prohibit* the erection of certain analogous establishments, among them stock-yards, pig-pens, cow stables and dairies; and power to *remove* and regulate the same. It also confers power to *regulate* and *prevent,* the carrying on of *any business* which may be dangerous and detrimental to the public health. Beyond these grants of power, the power conferred in regard to nuisances generally seems as extensive and summary as could well be. The mayor and municipal assembly have power to declare by acts of legislation what shall be nuisances ; and beyond this, the mayor has power, whenever *in his opinion* a nuisance exists on public or private property, or whenever a nuisance has been so declared by ordinance or resolution of the board of health, to abate and remove the same in a summary way, and at the cost of

the occupant of the premises. These are very sweeping and extensive grants of power. Whether they can be upheld as being "not inconsistent with the constitution or any law of this state," we need not now consider. Legislative power on the part of municipal corporations to declare nuisances has been restricted by judicial interpretation to the power to declare those things to be nuisances which are nuisances *per se;* that is which are necessarily and unavoidably nuisances, and which are accordingly said to be nuisances as matter of law. But where an establishment, trade, or occupation is lawful, and not in itself a nuisance, but nevertheless may become such from the place where or manner in which it is erected or carried on, it seems to be settled by the general current of authority that it is not competent for the legislative power, much less for the executive power of a municipal corporation, to make it a nuisance by merely declaring it to be such; but whether or not it shall be abated as a nuisance is a judicial question, to be decided in an action at law by the verdict of a jury ; or, under special circumstances, in a proceeding in equity by the decision of a judge ; the principle in both cases being that the party whose establishment or trade is sought to be abated as a nuisance is to be heard before he is condemned, and that evidence must be produced against him, and that he must have an opportunity of rebutting the same before his natural right to use his property in such manner as he may deem conducive to his own welfare shall be restrained in order to subserve the rights of others. This general doctrine, that the power to declare nuisances on the part of municipal corporations exists within those limits, is laid down by Judge Dillon in his work on Municipal Corporations, at considerable length. 1 Dill. Mun. Corp. (3d ed.), sects. 374–379.

It seems to be quite clear that the mayor and municipal assembly would not, under such a grant of power, have the authority by ordinance to declare an existing livery stable a

nuisance. Such a declaration, it seems, would be a deprivation of property without due process of law, and an invasion by the legislature of the powers of the judicial department of the government. If it could not declare an existing establishment, known perhaps to be highly offensive to the immediate inhabitants, to be a nuisance, such establishment not being a nuisance *per se* — for instance, a livery stable or a blacksmith's shop — I do not see how it can be held to possess the power of declaring in advance that such an establishment shall be prohibited because it may become a nuisance. To do this, it seems to me, would not only be an exercise by the legislative department of the city of a judicial power, but it would be going farther in the exercise of such a power than the judicial courts have ever gone; for it is a settled doctrine of the courts that judicial powers will not be exerted to enjoin an eventual or contingent nuisance. *Earl of Ripon v. Hobort*, 3 Milne & K. 169 ; *s. c.* Coop. Cas. Temp. Brougham, 333 ; *Mayor of Rochester v. Curtiss*, Clarke Ch. Cas. (N. Y.) 336 ; *Eastman v. Amoskeag Man. Co.*, 47 N. H. 71 ; *Laughlin v. President*, 6 Ind. 223, 227 ; *Dana v. Valentine*, 5 Metc. (Mass.) 8, 12 ; *Cleveland v. Gas Co.*, 20 N. J. Eq. 201 ; *Goodall v. Crafton*, 33 Ohio St. 271 ; *Rhodes v. Dunbar*, 57 Pa. St. 274 ; *Dorsey v. Allan*, 85 N. C. 358 ; *Ross v. Butler*, 19 N. J. Eq. 294 ; *Green v. Lake*, 54 Miss. 540, 546 ; *Duncan v. Hays*, 22 N. J. L. 25. It was upon this ground that Judge Dillon, in 1879, refused to enjoin this same plaintiff from erecting a livery stable in a block of the city of St. Louis devoted to residences. *Flint v. Russell*, 5 Dill. 151.

The power conferred by the sub-section of the charter last quoted " to declare, prevent, and abate nuisances on public or private property, *and the causes thereof*," is undoubtedly a very extensive power ; and while I am not willing to concede that it extends so far as to authorize the mayor and municipal assembly to make by an ordinance

that a nuisance which was not so before as a matter of law, yet I do not doubt that it does enable them to take precautions against eventual or contingent nuisances, by confining within certain limits certain establishments, trades, or occupations, which, from their known character, are likely to become such. I do not doubt that they can confine within certain limits and consequently prohibit within all other limits, the establishment of livery stables, white lead factories, tobacco factories, and other like establishments, which, though necessary and useful, and therefore not to be prohibited, are, nevertheless, according to general experience, offensive to those who dwell in their immediate vicinity, depriving such persons, to a material degree, of health or physical comfort, or both.

Nor do I suppose that, in order to the validity of an ordinance passed for this purpose, it is necessary that it should recite that it is passed for the purpose of regulating or restricting a certain thing because it is likely to cause a nuisance. In other words, I think it must be conceded, as the learned counsel for the defendant argues, that it is not necessary in order to the validity of a municipal ordinance, that it should recite the specific grant of power in the exercise of which the same is passed. *Young* v. *St. Louis*, 47 Mo. 494; *Kiley* v. *Forsee*, 57 Mo. 395.

III. The power to pass the ordinance in question is also claimed under what is known as the general welfare clause of the charter — the fourteenth and last clause of the section which contains the grant of legislative powers to the corporation. This, read in connection with the enacting clause, is as follows: " The mayor and assembly shall have power within the city, by ordinance not inconsistent with the constitution or any law of this state, or of this charter: * * * Fourteenth. Finally, to pass all such ordinances, not inconsistent with the provisions of this charter, or the laws of the state, as may be expedient, in maintaining the peace, good government, health, and welfare of the city, its

trade, commerce, and manufactures, and to enforce the same by fines and penalties not exceeding five hundred dollars, and by forfeitures not exceeding one thousand dollars." 2 Rev. Stats. 1588.

This clause, I take it, was not intended to increase or enlarge any of the powers already specially enumerated. It was intended as a precautionary enactment, to the end that the enumeration of powers already recited should not be held to exclude other powers of an analogous character which might be found expedient, under changing circumstances, for the maintenance of the peace, good government, health, and welfare of the city, its trade, commerce, and manufactures. We are indebted to the learned and exhaustive brief of the appellant for the citation of some decisions which indicate the nature of the power thus conferred. In *St. Louis* v. *Cafferata* (24 Mo. 96), an ordinance prohibiting the keeping open of shops on Sunday was held valid under the general welfare clause of the charter of St. Louis of 1851, which was substantially the same as the corresponding clause of the present charter. In *The State* v. *Cowan* (29 Mo. 330), the above decision was referred to with approval, and an ordinance prohibiting furious riding through the streets of Bolivar was held valid, under a charter power enabling the trustees to pass such ordinances " for the regulation and police of said town as they shall deem necessary, not repugnant or contrary to the laws of the land." The power to pass ordinances prohibiting the erection of wooden buildings within the limits of towns or cities with the view of preventing conflagrations, is supposed by a learned writer to be embraced within a general grant of power to provide for the safety and welfare of the inhabitants. Dill. Mun. Corp. (3d ed.), sect. 405. If the grants of power previously considered were not sufficient for the purpose, I should not doubt that, under this grant of power, it would be competent for the municipal legislature to prescribe by an ordinance reasonable in itself, and not inconsistent with the

constitution or general laws of the state respecting the rights of private property, the localities or proper limits within which alone certain offensive trades and occupations shall be carried on.

All the members of the court are of opinion that the mayor and municipal assembly of St. Louis have power, under the charter of the city, to regulate livery, boarding, and sale stables within the limits of the city, with the view of promoting the comfort of the inhabitants of the city, by prescribing the place where such establishments may in future be erected, and by prohibiting their erection in all other places. Two questions, however, touching the validity of this ordinance remain to be considered, upon which the members of the court are not agreed. The first is whether the ordinance is a reasonable exercise of the power of the city as above stated; the second is whether it is not a delegation of legislative power. Judges LEWIS and BAKEWELL are both of opinion that the ordinance is a reasonable exercise of the power of the city in the premises, and that it is not void as being an attempted delegation of legislative power. As I can not speak for the other members of the court upon questions in respect of which I do not agree with them, I shall limit myself to announcing the conclusion of the majority of the court, at the same time taking occasion to state the reasons which influence me in disagreeing with the majority upon these two remaining questions.

IV. The first of these questions is whether the ordinance is a reasonable exercise of the power conferred upon the city by its charter, as above defined. It is to be observed that, in order to the validity of a municipal ordinance, under the charter of St. Louis, three things are necessary: 1. The power to pass it must either be expressly or by necessary implication granted in the charter. 2. The charter provision granting it must itself be valid — that is, it must be in harmony with the constitution and laws of the state. 3. In addition to these, the ordinance must be a reasonable

exercise of the power granted. It follows that something more is necessary, in order to the validity of a municipal ordinance, than that it should have been passed in pursuance of a power conferred by the charter. The charter provision itself may be invalid; the ordinance may be invalid because an unreasonable exercise of the power conferred by the charter.

' By the constitution of this state, the charter of the city of St. Louis is required to be " in harmony with and subject to the constitution and laws of Missouri." Const. Mo., art. 9, sect. 20. The constitution of this state, in the bill of rights, provides that all persons have a natural right to life, liberty, and the enjoyment of the gains of their own industry." Const. Mo., art. 12, sect. 4. This, of course, does not confer upon any one the absolute right to use his property as he pleases. No such right exists in a state of civil society; but, on the contrary, the right of one to use his own must always be exercised in subordination to the rights of others, in conformity with the maxim *sic utere tuo ut alienum non lœdas.* *The State* v. *Addington*, 12 Mo. App. 214, 217; *s. c.* affirmed 77 Mo. 110. The same instrument provides that " no person shall be deprived of life, liberty, or property, without due process of law." *Ibid.*, sect. 30. Clearly, this provision was not intended to withdraw the rights of private property from the reasonable exercise of the police power by the legislative branch of the government. *The State* v. *Addington*, *supra.* " All rights are held subject to the police power of the state." *Beer Co.* v. *Massachusetts*, 97 U. S. 25, 32. Nor does that clause of the constitution of the United States which provides, " nor shall any state deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws," restrain the legislative power of a state from a reasonable exercise of the police power. *Slaughter-house Cases*, 16 Wall. —; *Barte-*

*meyer* v. *Iowa*, 18 Wall. 129 ; *Beer Co.* v. *Massachusetts, supra.*

Although this is, perhaps, the most extensive power of government, for it appeals for its very existence to the maxim *salus populi suprema lex* (*Beer Co.* v. *Massachusetts, supra*), yet the decisions generally agree that it is not an unrestrained power. It " can not be exercised capriciously, so as to strike down the right of liberty or property, where no real or apparent benefit will be promoted thereby." *The State* v. *Addington, supra.* And when it is clearly so exercised, the judicial courts, upholding the rights secured by the constitutional guarantees above quoted, will declare the statute void, and refuse to enforce it.

For still stronger reasons, the judicial courts will declare a municipal ordinance invalid when it transcends a reasonable and proper exercise of the police or other powers conferred by the municipal charter. It is not necessary to refer to decisions to show that the by-laws or ordinances of municipal corporations may be declared invalid by the judicial courts, when they are clearly unreasonable. There is no question of the existence of the power. But it can not escape attention that this power is in the nature of a judicial veto upon the acts of municipal legislatures, which under our system of municipal government, are elected by the people; whose members, drawn from all classes of the community, perform their legislative functions under the immediate eye of their constituents; and who are, hence, presumptively better able to judge of what is a reasonable exercise of their powers than the judicial courts are. This being so, " a clear case should be made out to authorize an inference upon the ground of unreasonableness." *City of St. Louis* v. *Weber*, 44 Mo. 547, 550, per Bliss, J. . " That a large and liberal discretion is to be allowed to the municipal authorities is conceded." *City of Cape Girardeau* v. *Riley*, 72 Mo. 220, 224, per Napton, J. The

grounds on which such ordinances may be declared invalid on the head of unreasonableness, have been indicated by our supreme court in three cases : In the first, it was said that an ordinance may be so declared if it " is oppressive, unequal, and unjust." *City of St. Louis* v. *Weber, supra.* In the second case it was said that it might be so declared if it was " altogether unreasonable and oppressive," and evidence was admissible to prove a state of facts leading to this conclusion. *Corrigan* v. *Gage*, 68 Mo. 541, 545, per Sherwood, J. It was so held of an ordinance providing for the collection of delinquent city taxes, which imposed a penalty of $25 for the city attorney's fee in case suit should be brought and judgment recovered for the taxes by the city, and an additional fee of $50 for the city attorney's fee in case of an appeal to the supreme court. The imposition of these penalties, in addition to two per cent a month as interest, was held unreasonable. *City of Cape Girardeau* v. *Riley*, 72 Mo. 220.

With these expressions of our supreme court for our guide, I think it clear that, assuming that this ordinance is otherwise within the scope of the powers conferred upon the legislature of the city, we ought to declare it unreasonable. It is to be observed that it does not purport or attempt to prescribe any place or places within the limits of the city within which alone livery stables may in future be erected or carried on ; but that it remands the decision, in every case, to the vote of the owners of one-half the ground in the particular block in which the livery stable is sought to be established. It is easy to see that this may amount to an entire prohibition within the limits of the city of the erection of any livery stables not already in existence, according to the opinion or caprice of property owners in particular localities. It is well settled that a livery stable is not a nuisance *per se*. *Aldrich* v. *Howard*, 7 R. I. 87 : *s. c.* 8 *Id.* 246 ; *Burditt* v. *Severson* 17 Texas, 489 ; *Dargan* v. *Waddill*, 9 Ired. Law, 224 ; *Kirkman*

*v. Handy*, 11 Humph. 406; *Croker v. Birge*, 10 Ga. 336; *Harrison v. Brooks*, 20 *Id.* 537; *Morris v. Brower*, 1 Anth. 368; *Ball v. Ray*, L. R. 8 Ch. 467; *Broder v. Saillard*, 2 Ch. Div. 692. It is unnecessary to suggest that it is an employment which is highly necessary and conducive to the comfort and convenience of the inhabitants of a city. It is equally obvious that there are many localities in a large city like St. Louis, where the keeping of a livery stable in the ordinary mode could not be adjudged a nuisance. In the vicinity of a white lead factory, a soap factory, a bone factory, or a tannery, a livery stable would smell sweet. And yet, under the operation of this ordinance, a man might own one corner of a block embracing one-fourth of the ground in it. On the other corner there might be a white lead factory, on the other a soap factory, and on the other a tannery; and yet, without the consent of two of the other three proprietors of the block, each of them maintaining an establishment much more offensive to the public, the owner of the vacant lot could not use it for the purpose of a livery stable. It may be said that this illustration supposes an extreme case. I do not think so. I do not think that where the owners of one-half the ground in a block have a veto upon the erection of a livery stable in the block, human nature being what it is, they would hesitate to demand their price for the granting of the privilege. I do not think that it is competent for the legislature of a city thus to allow the owners of one-half the land in a block, wholly without reference to the uses to which they have put their own property, and wholly without reference to the location and surroundings, to prohibit any lot owner in the block from making a lawful use of his property, when such use of it might not be a nuisance at all in that locality. If this ordinance is upheld as valid, then every livery stable keeper in the city, when, by reason of an increase of public patronage, his present

location becomes inadequate for his business, will be sent as a mendicant from block to block, hat in hand, soliciting the privilege of establishing and carrying on his lawful calling.

V. I also think that this ordinance is invalid as an attempt on the part of the legislature of the city to delegate to the owners of one-half the ground in each block of the city the power which the charter has committed to such legislature, of determining whether a certain trade which is likely to become a nuisance shall be restrained in that locality. It seems to me to be an attempt to delegate a legislative power, and to be for this reason void. *Ruggles v. Collier*, 43 Mo. 353; *City of St. Louis v. Clemens, Id.* 395; *City of St. Louis v. Clemens*, 52 Mo. 133; *Thompson v. Boonville*, 61 Mo. 282; *Mathews v. City of Alexandria*, 68 Mo. 119. It is more; it is an attempt to confer upon the inhabitants of such block a judicial power more extensive than the judical courts have ever exercised — the power to enjoin an eventual or contingent nuisance. That courts of equity will never exercise this power has already been shown by a numerous citation of cases, including one in which the exercise of this power was sought against this very plaintiff, and denied by an eminent judge. *Flint v. Russell*, 5 Dill. 151.

But a majority of the court being, as already stated, of opinion that the passage of this ordinance was within the power of the mayor and municipal assembly of the city of St. Louis, it merely remains for me to announce the judgment of the court; which is that the judgment of the circuit court be reversed, and the judgment be entered in the court here for the defendant. Judges LEWIS and BAKEWELL concur in this conclusion; I dissent from it, for the reasons above stated.