[Crim. No. 1690. In Bank.—October 19, 1911.]

## Ex Parte QUONG WO on Habeas Corpus.

MUNICIPAL CORPORATION—LOS ANGELES—DIVISION OF CITY INTO INDUS-
TRIAL AND RESIDENCE DISTRICTS—MODIFICATION OF BOUNDARIES—
PROHIBITION OF CLASSES OF OCCUPATIONS—PUBLIC LAUNDRY—REA-
SONABLENESS OF RESTRICTIONS.—The City of Los Angeles has power,
by ordinance, to divide its territorial limits into industrial and
residential districts, and by subsequent ordinances to change the
boundaries thereof, and to prohibit the carrying on within the resi-
dential district as so originally established or subsequently modified
of certain kinds of business, among others the business of a public
laundry, where there is nothing to indicate that the distinctions so
made with reference to the particular localities affected were un-
reasonable, and the ordinances were not intended to operate peculiarly
against any particular race, and make no unlawful discrimination
between persons or classes of persons, but apply equally and uni-
formally to all engaged in the kinds of business prohibited.

ID.—CONSTRUCTION OF ORDINANCE—ABSOLUTE PROHIBITION ON CERTAIN
OCCUPATIONS.—An ordinance rendering it unlawful to carry on in
a residential district certain enumerated occupations "'where power
other than animal power is used to operate, or in the operation of
the same, or any haybarn, woodyard, lumber yard, public laundry
or washhouse," and providing that a permit might be granted to
install and maintain an electric motor in any such place in such
residence district in which a permit to install a steam boiler has
been granted prior to the adoption of the ordinance, should be con-
strued as absolutely prohibiting "any haybarn, woodyard, lumber
yard, public laundry or washhouse" within the residence district,
whether existing at the time of the ordinance or not, and regardless
of the kind of power used therein. As to such prohibited places,
the proviso as to substitution of electric for steam power has no
application.

ID.—FAILURE TO PROSECUTE OTHER VIOLATORS NOT DISCRIMINATION.—A
person charged with a violation of such ordinance cannot base a
claim of discrimination in the manner of its enforcement upon the
mere fact that there are several steam laundries operating within
the residential district, where it does not appear that they are
operating with the consent of the city authorities, or that criminal
prosecutions have not been instituted against those carrying them on.

ID.—EXCEPTION OF SMALL AREAS FROM RESIDENCE DISTRICT—ARBITRARY
DISCRIMINATION.—In the absence of anything indicating a con-
trary intent, the subsequent action of the city council in excepting,
by ordinance, certain comparatively small parcels of land from
the residential district as originally established, is presumed to be
reasonable, and without arbitrary discrimination. That some of the

parcels so excepted were small in area, consisting of only one city lot, and were surrounded on all sides by portions of what was under the ordinance "residence district," does not in itself warrant a contrary conclusion.

Id.—Police Power—All Property Subject to—Laundry Proprietor Having Leasehold Interest.—All property is held subject to the lawful exercise of the police power, and the fact that the proprietor of the laundry has an unexpired leasehold interest in the premises upon which he conducts his laundry is immaterial in determining the question of the validity of the ordinance.

Id.—Laundries May be Restricted to Defined Places.—The business of operating a public laundry or washhouse, although a lawful and necessary occupation and not necessarily a nuisance *per se*, is of such a nature that it may be confined, in the lawful exercise of the police power, within defined limits in a city or town.

Id.—Reasonable Restrictions on Lawful Business.—The power to regulate the carrying on of certain lawful occupations in a city includes the power to confine the carrying on of the same to certain limits, whenever such restrictions may reasonably be found necessary to subserve the ends for which the police power exists, viz: to protect the public health, morals, safety, and comfort.

Id.—Determination of Legislative Body Presumptively Valid—Review by Courts.—It is primarily for the legislative body clothed with the police power to determine when such regulations are essential, and its determination in this regard, in view of its better knowledge of all the circumstances and the presumption that it is acting with a due regard for the rights of all parties, will not be disturbed by the courts, unless it can be seen that the regulation has no relation to the ends above stated, but is a clear invasion of personal or property rights under the guise of police regulation. In the present case, the court cannot say, that as to public laundries and washhouses, the conclusion of the city council of Los Angeles was unreasonable.

Id.—Portions of Residence District Sparsely Populated—Laundry Not Located in Such Portions.—The mere fact that large portions of the residence district as defined by the ordinance are sparsely built up, does not indicate any improper design on the part of the city council in including such portions in the residence district, or invalidate the ordinance as to a laundry proprietor whose laundry was not situated within any portion of such district that was sparsely populated, it not appearing that any place prohibited by the ordinance is maintained or is desired to be maintained within any portion of the district that is sparsely populated.

APPLICATION for a Writ of Habeas Corpus directed to the Chief of Police of the City of Los Angeles.

The facts are stated in the opinion of the court.

George S. Hupp, and Frank C. Hill, for Petitioner.

Guy Eddie, City Prosecutor, and Ray E. Nimmo, Deputy City Prosecutor, for Respondent.

ANGELLOTTI, J.—By ordinance No. 19,500 (New Series), adopted by the city council on December 28, 1909, and approved by the mayor December 30, 1909, seven "Industrial Districts" numbered from 1 to 7 respectively, were established in the city of Los Angeles. By ordinance No. 19,563 (New Series), approved January 10, 1910, all of the city of Los Angeles except those portions of the said city included within the boundaries of such industrial districts and such fire districts as are now or may be hereafter established and designated as such by ordinance, and also excepting that portion of the said city lying south of Manchester Avenue, and also except such portions of the said city as have heretofore been or may hereafter be excepted by ordinance from the said residence district, was established and declared to be a "Residence District." By this ordinance it was declared to be unlawful to maintain or carry on certain kinds of occupation within such residence district. By ordinance number 21, 996 (New Series), approved March 8, 1911, the only section of said ordinance 19,563 referring to public laundries and washhouses (sec. 2) was amended to read as follows: "It shall be unlawful for any person, firm or corporation to erect, establish, maintain or carry on within the residence district described in section 1 hereof, any stone crusher, rolling-mill, carpet-beating establishment, fireworks factory, soap factory, or any other works or factory where power other than animal power is used to operate, or in the operation of the same, or any haybarn, woodyard, lumber yard, public laundry or washhouse; provided, that the board of fire commissioners may grant a permit to install and maintain an electric motor in any such place in such residence district in which a permit to install a steam boiler has been granted prior to the adoption of this ordinance; but in no case shall a permit be granted to install an electric motor in any such place except to take the place of a steam boiler in such place, and such permit shall be granted only upon condition that such steam boiler shall be removed from such place and the use thereof discontinued and aban-

doned immediately upon the installation of such electric motor; and in no case shall a permit be granted to install an electric motor of greater horsepower than the steam boiler so to be removed and abandoned." The substantial change made by the amendment in the original section 2 was to take the term "public laundry or washhouse" from the occupations named prior to the clause "or any other works or factory where power other than animal power" etc., and to place it in conjunction with the sentence "or any haybarn, woodyard or lumber yard." By sections 3, 4, and 5, of said ordinance number 19,563 it was made unlawful to maintain within the residence district certain specified occupations,—viz., any hospital, or any asylum for the feeble minded, or any place where wine or brandy is manufactured, or any blacksmith shop, it being provided that the prohibition should not apply to any such place being lawfully maintained at the time of the adoption of the ordinance. Since the arrest of petitioner upon the charge under which he is held in custody, which was on April 13, 1911, his alleged offense being charged to have been committed on the day of his arrest, an ordinance has been adopted, making, it may be conceded, materially different provision as to the subject-matter of ordinance 19,563 and all ordinances amendatory thereto or thereof, and repealing such ordinances, providing, however, that such repeal shall not affect the prosecution and punishment of any one for violation of any of said repealed ordinances, or affect any pending proceeding or action for violation of any such ordinances. (Ordinance number 22,798 [New Series], approved June 17, 1911.) This case, of course, must be determined upon the law as it stood at the date of petitioner's alleged offense, and without regard to the provisions of the new ordinance.

The petitioner was charged with having, on April 13, 1911, maintained and carried on "a public laundry and washhouse at number 721 South Flower Street in said city within the residence district of said city of Los Angeles described in section 1 of ordinance number 19,563 (New Series) of said city," etc. He was convicted of this offense, and is held in custody under the judgment pronounced upon such conviction. By this proceeding he seeks his discharge from such custody.

The petitioner, who is a native and citizen of the Empire of China, has been engaged for several years in conducting such

laundry and washhouse at said location, occupying the premises under a lease which has two years yet to run. He has paid the customary license required by the city to conduct such business, up to and including the month of June, 1911. As we understand the stipulated facts, no power other than animal power was used in the operation of this laundry, it being a hand laundry as distinguished from a steam, electric, or other power laundry.

The city of Los Angeles contains about ninety-four square miles. Large portions of the established residence district are sparsely built up, while large portions are closely built up and thickly populated. The established industrial districts are in some places not thickly or closely built up, but some portions are, and where so built up there are large quantities of smoke and soot, and such district "is situate a great distance from petitioner's laundry and his customers." Petitioner's laundry is within the established residence district, and in a portion thereof that is apparently closely built up, and not sparsely populated.

Since the adoption of said ordinance number 19,563, the city council has by ordinance excepted from the residence district and included within the industrial district in excess of forty small parcels of land. These exceptions are scattered throughout the residence district, and in many instances consist of a single lot in a tract. Ten of these exceptions are specified, one having an area of about four hundred feet square at the corner of Tenth and Main Streets, upon which is now in operation an automobile factory, employing steam as the motive power and having about two hundred employees. Other exceptions specified are small parcels of land having a frontage of about three hundred feet and a depth of about one hundred and twenty-five feet, at the corner of Washington and Arlington Streets, at the corner of Washington and Hoover streets, at the corner of Washington and Figueroa streets, on Pico Street between Georgia and Sentous streets, etc. and some "ordinary sized city lots." There is, however, nothing to indicate that any of these exceptions was arbitrarily made, or that the situation of the land thus taken from the residence district and placed in industrial territory was not such with reference to all the circumstances, as to reasonably warrant the action of the city authorities.

The laundry of petitioner is no more dangerous and unsafe to the residents of the locality in which it is situate than any other laundry. Seven persons residing in the vicinity thereof testify that they have not noticed any offensive odors, or loud or unusual noises from its operation, that no sickness has been caused to any of their respective families thereby, and that the operation of the laundry has not in any way affected their safety, comfort, or welfare or, to their knowledge, that of any resident in the neighborhood.

There are several steam laundries operating within said residence district. The foregoing facts are established for all the purposes of this case by the stipulation of the parties.

There is absolutely nothing to indicate that the ordinance was intented in any of its features to operate peculiarly against the Chinese or any other particular race. So far as any contention of unlawful discrimination between persons or classes of persons is concerned, it is certainly fair on its face, applying equally and uniformly to all engaged in the kind of business enumerated. It is claimed that the ordinance discriminates without reason against the existing hand laundry and in favor of the existing steam laundry, in that it permits an existing steam laundry to continue upon installing an "electric motor" in lieu of the "steam boiler," while an existing hand laundry is compelled to cease operations altogether. It might be difficult to sustain any such distinction, but we do not think that section 2 of the ordinance as amended March 8, 1911, can reasonably be construed as meaning what is claimed for it by petitioner. While the intent of the framers is perhaps not as clearly expressed as it might have been, we are of the opinion that the only reasonable construction of the section is that the kinds of places enumerated after the clause "or any other works or factory where power other than animal power is used to operate," viz.: "any haybarn, woodyard, lumber yard, public laundry or washhouse," are all absolutely prohibited within the residence district, whether existing at the time of the amendment or not, and regardless of the kind of power used therein, and that the proviso as to substitution of electric for steam power has no application to any such prohibited place. There is no foundation for any claim of discrimination in the enforcement of the ordinance. The mere fact that there are several steam laundries operating within the residence

CLXI Cal.—8

district, which is the whole of the stipulation in this regard, is not sufficient to show such discrimination. It does not appear that they are operating with the consent of the city authorities, or that criminal prosecutions have not been instituted against those carrying them on. We do not construe the ordinance as intended to confer upon the council any arbitrary power in the matter of excepting by ordinance from the residence district such portions of such district as originally established as it sees fit to except. Section 1 of the ordinance simply defines the residence district to be such portions of the city as are not included in the territory constituting the industrial district, as such territory is established or may be established from time to time by ordinance. If the city council has the power to confine an occupation within prescribed limits, it must have the power to make changes in the limits so prescribed, the only limitation being, as in the case of the original fixing of the limits, that the boundaries fixed must not be unreasonable. We cannot judicially say that there has been any unreasonable discrimination in any of the changes made by excepting from the original residence district certain comparatively small parcels of land. The presumption is always in favor of the action of the legislative body in such matters and there is absolutely nothing to indicate that the property so excepted was not so situated, with reference to all the circumstances, as to make it reasonably proper that it should constitute a part of the industrial district, or that there was anything arbitrary in the action of the council in regard thereto. That some of the parcels so excepted were small in area, consisting of only one city lot, and were surrounded on all sides by portions of what was under the ordinance "Residence district," does not in itself warrant a contrary conclusion. In this connection the case of *Fischer* v. *St. Louis,* 194 U. S. 361, [48 L. Ed. 1018, 24 Sup. Ct. 673], is in point. An ordinance of the city of St. Louis prohibited the maintenance within the city, without permission from the municipal assembly, of any dairy and cow stable, not in operation at the time of the approval of the ordinance. The supreme court of Missouri had upheld the ordinance against the claim that it was void because of the power given to the municipal assembly to grant permission to maintain such a dairy, as it saw fit, and because, therefore, the assembly might discriminate against one appli-

cant and favor another. Disposing of this claim, the court said: "We cannot and shall not indulge any such presumption against the integrity of the municipal assembly, but shall . . . assume that the municipal assembly, upon granting permission, will inquire and determine whether the place and neighborhood is a proper one in which to allow a dairy to be maintained and will act impartially." (*City of St. Louis* v. *Fischer,* 167 Mo. 654, 663, [99 Am. St. Rep. 614, 64 L. R. A. 679, 67 S. W. 872].) The United States supreme court said: "We do not regard the fact that permission to keep cattle may be granted by the municipal assembly as impairing in any degree the validity of the ordinance, or as denying to the disfavored dairy keepers the equal protection of the laws. Such discrimination might well be made where one person desired to keep two cows and another fifty; where one desired to establish a stable in the heart of the city and another in the suburbs, or where one was known to keep his stable in a filthy condition, and another had established a reputation for good order and cleanliness. . . . The question in each case is whether the establishing of a dairy and cow stable is likely, in the hands of the applicant, to be a nuisance or not to the neighborhood, and to imperil or conduce to the health of its customers. As the dispensing power must be vested in some one, it is not easy to see why it may not properly be delegated to the municipal assembly which enacted the ordinance. Of course, cases may be imagined where the power to issue permits may be abused and the permission accorded to social or political favorites and denied to others, who for reasons totally disconnected with the merits of the case are distasteful to the licensing power. No such complaint, however, is made to the practical application of the law in this case, and we are led to infer that none such exists. We have no criticism to make of the principle of granting a license to one and denying it to another, and are bound to assume that the discrimination is made in the interest of the public, and upon conditions applying to the health and comfort of the neighborhood (citing cases). . . . We see no difficulty in vesting in some body of men, presumed to be acquainted with the business and its conditions, the power to grant permits in special cases. It has been held in some of the state courts to be contrary to the spirit of American institutions to vest this dispensing power in the hands of a single

individual (citing authorities), and in others that such an
authority cannot be delegated to the adjoining lot owners.
(Citing authorities.)   But the authority to delegate that dis-
cretion to a board appointed for that purpose is sustained by
the great weight of authority (citing authorities), and by this
court the delegation of such power, even to a single individual,
was sustained in *Wilson* v. *Eureka City,* 173 U. S. 32, [43 L.
Ed. 603, 19 Sup. Ct. 317], and *Gundling* v. *Chicago,* 177 U. S.
183, [44 L. Ed. 725, 20 Sup. Ct. 633]."

Nothing is better settled than the proposition that property
is held subject to the lawful exercise of the police power, and
the fact that petitioner has an unexpired leasehold interest in
the premises upon which he conducts his laundry is, therefore,
of no consequence in determining the question of the validity
of the ordinance.   (See *Grumbach* v. *Lelande,* 154 Cal. 684,
[98 Pac. 1059], and cases there cited.)

This brings us to what we deem the main contention in this
proceeding.   Is the business of operating a public laundry or
washhouse of such a nature that it may be confined, in the
lawful exercise of the police power, within defined limits in
a city or town ?

It must be admitted, of course, that the business of con-
ducting a public laundry is a lawful and necessary occupation,
and that such a laundry is not necessarily a nuisance *per se.*
But this fact alone does not prevent the enactment of such
regulations regarding it as may be reasonably found necessary
for the safety, health, and comfort of society at large.   There
are many lawful and necessary occupations, not constituting
nuisances *per se,* as to which such regulations by a city have
been found necessary.   It was said in *Ex parte Lacey,* 108
Cal. 326, [49 Am. St. Rep. 93, 38 L. R. A. 640, 41 Pac. 411],
involving the question of the validity of an ordinance prohibit-
ing the operation of any steam shoddy machine or steam carpet-
beating machine within one hundred feet of any church, school
house or dwelling-house : "Indeed, as to nuisances *per se,* the
general laws of the state are ample to deal with them.   But
the business here involved may properly be classed with livery
stables, laundries, soap and glue factories, etc., a class of busi-
ness undertakings in the conduct of which police and sanitary
regulations are made to a greater or less degree by every city
in the country."   Cases in which municipal regulations as to

the carrying on the laundry business have been upheld as constituting a reasonable exercise of the police power are numerous. While the cases usually involved simply regulations as to the manner of carrying on the business without prohibiting it in any particular locality, it has been held in this state that an ordinance prohibiting the carrying on of the business within a prescribed portion of a town is a lawful exercise of the police power. (See *In re Hang Kie,* 69 Cal. 149, [10 Pac. 327].) The correctness of this decision has never, so far as we can ascertain, been questioned by this court or the United States supreme court. Nothing said in *Ex parte Sing Lee,* 96 Cal. 354, [31 Am. St. Rep. 218, 24 L. R. A. 195, 31 Pac. 245], can reasonably be held to disapprove it. In the latter case the ordinance held invalid prohibited the carrying on of such business in all but two blocks of Chico, without a permit from the board of trustees of the town, and it was made a prerequisite to the obtaining of such permit that the person applying should have first obtained the written consent of a majority of the real property-owners within the block in which it was proposed to carry on such business, and also of the four blocks immediately surrounding such block. It was simply held that the effect of this provision was to commit the right to carry on such business at all, in all but two blocks of the town, to the unrestricted will and caprice of a majority of the real property-owners of the block upon which it was proposed to establish such laundry, and of the four blocks immediately surrounding the same, and that this constituted an unauthorized interference with the right of a person to engage in a lawful occupation, and the right of the owner of property to devote it to a lawful purpose. Nor do we think that the Hang Kie case is overruled or questioned by *Ex parte Whitwell,* 98 Cal. 73, 83, [35 Am. St. Rep. 152, 19 L. R. A. 727, 32 Pac. 870]. The rule declared in the last mentioned case that "a law or ordinance, the effect of which is to deny to the owner of property the right to conduct thereon a lawful business, is invalid unless the business to which it relates is of such a noxious or offensive character that the health, safety, or comfort of the surrounding community requires its exclusion from that particular locality" is not necessarily opposed to such decision. In *Yick Wo* v. *Hopkins,* 118 U. S. 356, [30 L. Ed. 220, 6 Sup. Ct. 1064], the ordinances involved were held un-

enforceable against the plaintiff in error because they not only *seemed intended* to confer not a discretion to be exercised upon a consideration of the circumstances of each case, but a naked and arbitrary power to give or withhold consent not only as to places but as to persons, but that their practical administration had been directed so exclusively against a particular class of persons as to warrant and require the conclusion that, whatever may have been the intent of the ordinances as adopted, they were applied with a mind so unequal and oppressive as to amount to a practical denial by the state of that equal protection of the laws which is guaranteed

There can be no question that the power to regulate the carrying on of certain lawful occupations in a city includes the power to confine the carrying on of the same to certain limits, whenever such restrictions may reasonably be found necessary to subserve the ends for which the police power exists, viz.: to protect the public health, morals, safety, and comfort. It is, of course, primarily for the legislative body clothed with this power to determine when such regulations are essential, and its determination in this regard, in view of its better knowledge of all the circumstances and the presumption that it is acting with a due regard for the rights of all parties, will not be disturbed in the courts, unless it can plainly be seen that the regulation has no relation to the ends above stated, but is a clear invasion of personal or property rights under the guise of police regulation. In the case of *Grumbach* v. *Lelande,* 154 Cal. 679, [98 Pac. 1059], in which this court declared the well-settled rule last stated, it is said: "It is well settled that it is entirely within the police power to limit the conduct of the liquor or other businesses coming within its regulatory scope or to exclude such businesses from specified districts." (Citing cases.) The limitation in the case last cited was in regard to the business of selling intoxicating liquors, but the power is by no means confined to occupations of that character, and whatever be the business or occupation to which it is attempted to be applied, the question of the validity of the limitation depends on whether it has some relation to the ends for which the police power is conferred. The necessity of such regulation in the case of necessary and lawful occupations carried on in cities and towns, was recognized by the supreme court of the United States in *Crowley* v. *Christensen,*

137 U. S. 90, 34 L. Ed. 620, 11 Sup. Ct. 15], where it is said: "Some occupations by the noise made in their pursuit, some by the odors they engender and some by the dangers accompanying them, require regulation as to the locality in which they shall be conducted." That the power to regulate includes the power to confine certain occupations within prescribed limits in a city has been held in many cases, of which the following are examples: *Ex parte Byrd,* 84 Ala. 17, [5 Am. St. Rep. 328, 4 So. 397]; *In re Wilson,* 32 Minn. 145, [19 N. W. 723]; *Shea* v. *City of Muncie,* 148 Ind. 14, [46 N. E. 138]; *Cronin* v. *People,* 82 N. Y. 318, [37 Am. Rep. 564]; *City of Newton* v. *Joyce,* 166 Mass. 83, [44 N. E. 116]; *State* v. *Beattie,* 16 Mo. App. 131; *Ex parte Lacey,* 108 Cal. 326, [49 Am. St. Rep. 93, 38 L. R. A. 640, 41 Pac. 411]. In the last mentioned case the limitation was, as we have seen, regarding the operation of a steam shoddy or steam carpet-beating machine; in *State* v. *Beattie,* 16 Mo. App. 131, a livery stable; in *City of Newton* v. *Joyce,* 166 Mass. 83, [44 N. E. 116], a livery stable for more than four horses; in *Cronin* v. *People,* 82 N. Y. 318, [37 Am. Rep. 564], the slaughtering of cattle; in *Ex parte Byrd,* 84 Ala. 17, [5 Am. St. Rep. 328, 4 So. 397], the selling of fresh meat; and in the other cases the sale of intoxicating liquor. Warrant for this character of regulation in regard to all these occupations and many others that might be named is to be found in the fact that it may reasonably be determined necessary to the health, morals, safety, or comfort of the people of a city. It was said by this court in the matter of *Yick Wo,* 68 Cal. 297, [58 Am. Rep. 12, 9 Pac. 141], quoting from Chancellor Kent: "Unwholesome trades, slaughter houses, operations offensive to the senses, the deposit of powder, the application of steam power to propel cars, the building with combustible materials, and burial of the dead, may all be interdicted by law, in the midst of dense masses of population, on the general and rational principle that every person ought to so use his property as not to injure his neighbor; and that private interests must be made subservient to the general interests of the community. (2 Kent's Com., 340.)"

In the *San Chung case,* 11 Cal. App. 511, [105 Pac. 609], an ordinance prohibiting the carrying on of a public laundry or washhouse in the city of Sacramento, in any building that shall be occupied as a store, restaurant, or saloon, or that is

frequented or occupied by many persons, or that is occupied
as a stopping place by transient guests, etc., or in any annex
or outhouse of such a building, was sustained as being a war-
rantable exercise of the police power in the matter of the
protection of the health of the people. It was recognized by
the court, in accord with the claim of the city "that the
conditions under which laundries are operated are favorable
for the propagation of disease, that the soiled garments re-
ceived and handled in such places are liable to communicate
deleterious germs to the circumambient atmosphere, giving rise
to danger of infection to persons coming into close proximity
to these surroundings." It was said: "Formerly such legis-
lation would have been regarded as an unwarranted encroach-
ment upon the rights of the individual, but in view of the pro-
gress of the medical profession, the better understanding of
the nature of disease and its transmission, and the broader
conception of the duty of the municipality in regard to the
preservation and protection of the public health character-
istic of the present age, it seems upon its face to embody a
sensible and reasonable restriction, bearing a direct and effica-
cious relation to the accomplishment of a legitimate purpose
of police and sanitary legislation. At least, in the absence of
any evidence to that effect, we cannot say that the public
health is not thereby promoted or that the method adopted
is unreasonable and unnecessarily oppressive." This court
subsequently refused to issue a writ of *habeas corpus* in this
matter, thus practically sustaining the ordinance as a proper
exercise of the police power. Doubtless the same considera-
tions of public health would warrant a court in sustaining the
action of a municipality in prohibiting the operation of public
laundries in a densely populated neighborhood devoted to
residence purposes, that is, the court, in such a case, in the
absence of any evidence to that effect, could not say that
the public health is not promoted by such a regulation, or that
the same is "unreasonable and unnecessarily oppressive." The
design of the ordinance here involved undoubtedly was to
protect such portions of the city of Los Angeles as are devoted
principally to residence purposes from the dangers and dis-
comfort attendant upon the operation of certain kinds of busi-
ness which, while not necessarily nuisances *per se,* have always
been recognized as proper subjects of police regulation. We

do not feel warranted in saying that as to public laundries and washhouses, the conclusion of the city council was clearly unreasonable. As was said in *In re Smith*, 143 Cal. 372, [77 Pac. 182]; "As has been said, there must always be left a large discretion in the legislative body, with the exercise of which the courts will not and have no desire to interfere. Nor will they in any event interfere except where the case is plain that needless oppression is worked and constitutional rights invaded. . . . In city ordinances, as distinguished from county ordinances, the interest and requirements for protection of a thickly settled and growing community will often be widely different from those of sparsely settled and thinly inhabited rural districts. An ordinance limiting, regulating or even prohibiting, in a certain district within the corporate limits of a city, may be perfectly reasonable, where like limitations, restrictions, and prohibitions as to some district within the county, arbitrarily carved out, would be oppressive and unreasonable in the extreme. Owing to the peculiar conditions existing in cities, courts are not keen to question the wisdom of the legislative exercise of their police power in these respects." It is enough for the courts in such cases that "there may have been reasons actuating the council, good and sufficient in themselves, though not clearly appearing from a mere reading of the ordinance itself." (*Grumbach* v. *Lelande*, 154 Cal. 685, [98 Pac. 1059].) We cannot say that the contrary so clearly appears from what is shown in this case, as to warrant us in holding the regulation void.

The mere fact that "large portions of the residence district are sparsely built up" cannot affect the determination of this proceeding. Doubtless it was assumed by the city council that such portions would not be "sparsely populated" for any great length of time, an assumption probably warranted by the growth and population of the city during the last few years. So there is nothing in the action of the council in including such portions to indicate any improper design on its part. But the answer to petitioner's claim in his behalf is that his laundry is not situated within any portion of the district that is "sparsely populated," and that it does not appear that any place prohibited by the ordinance is maintained or is desired to be maintained within any portion of the district that is "sparsely populated." It follows that it does

not appear that the constitutional rights of any one are invaded by the inclusion of such "sparsely populated" territory.

We do not see how the facts shown by the affidavits of parties living near petitioner's laundry affect the question of the validity of the regulations.

The writ is discharged and the peitioner remanded to the custody of the chief of police of the city of Los Angeles.

Shaw, J., Sloss, J., Lorigan, J., and Melvin, J., concurred.

Rehearing denied.