[Crim. No. 4555. In Bank. Apr. 30, 1946.]

In re JAMES PORTERFIELD, on Habeas Corpus.

94

Clarence E. Todd for Petitioner.

Tobriner & Lazarus, Mathew O. Tobriner, P. H. McCarthy, Jr., F. Nason O'Hara, George G. Olshausen and Wayne M. Collins as Amici Curiae, on behalf of Petitioner.

Glenn D. Newton, City Attorney (Redding), for Respondent.

SCHAUER, J.—Petitioner James Porterfield, a labor organizer, stands convicted of violating Ordinance No. 251 of the city of Redding (now incorporated in the Redding Municipal Code). Such ordinance prohibits soliciting for compensation, without a license, of memberships in organizations requiring the payment of dues. This petition for habeas corpus is urged upon the grounds that the ordinance contravenes the state and federal Constitutions in numerous respects, and that it conflicts with the National Labor Relations Act and with statutes of the State of California and is therefore null and void. We conclude that portions of the ordinance, purporting to establish the standards upon which the licensing board shall act, are, as enacted, arbitrarily prohibitive of certain of

petitioner's constitutionally guaranteed rights and that the requirement of payment of a license fee in order to engage in solicitation of memberships, as applied in this case, contravenes the declared public policy of this state that workmen shall have full freedom of association and self-organization (see Lab. Code, § 923). Petitioner, therefore, is entitled to his release.

## Material Facts

The material facts are not in dispute. The city of Redding is a municipal corporation of the sixth class. Generally speaking, and subject to constitutional limitations and the public policy and general laws of the state, it has power to license, for the purposes of regulation and of revenue, all and every kind of business transacted or carried on in such city, and to fix rates of license taxes upon the same, and provide for their collection. (Municipal Corporation Act, § 862.12; Stats. 1935, p. 2071; 2 Deering's Gen. Laws 1937, p. 2537, Act 5233.)

Ordinance No. 251 was passed as an initiative measure in the year 1938 by the people of Redding. It provides in material part as follows:

"Section 1. It shall be unlawful for any person, firm or corporation, whether as principal, clerk, servant, agent, or employee, inside of the city limits of the City of Redding, by force, violence, menaces, threat, intimidation, coercion or corrupt means, either directly or indirectly, to seek, solicit, induce, or attempt to seek, solicit or induce, any person to join or take membership in any organization, or by force, violence, threat, intimidation, coercion or corrupt means, either directly or indirectly, to seek, solicit or induce, or attempt to seek, solicit or induce, any employer or other person to compel or induce any employee or any other person to join or take membership in any organization.

"Section 2. It shall be unlawful for any person, inside of the city limits of the City of Redding, to solicit or obtain membership for compensation in any organization which requires the payment of dues by such members without first having procured a license to do so, as in this ordinance provided.

"Section 3. The city council of the City of Redding is hereby designated as a licensing board for the issuance of license under this ordinance.

"Section 4. Any person desiring a license to engage in

or carry on the work of soliciting membership as herein provided shall make application in writing to said city council upon such forms as may be provided by said city council, a copy of which shall at all times be attached to said license.

"Section 5. Said application shall be filed with the clerk of the said City of Redding at least one week prior to the meeting of the city council at which said application shall be heard.

"Section 6. Upon said hearing the said city council shall receive evidence and determine whether said applicant is of good moral character, and is likely to use force, violence, threats, menace, coercion, intimidation or corrupt means in his proposed work of solicitation. If the city council is satisfied that said applicant is of good moral character and will not resort to force, violence, threat, menace, coercion, intimidation or corrupt means in his proposed work of solicitation, it shall direct the issuance of a license to said applicant for said purpose of solicitation upon payment of the license fee herein provided for.

"Section 7. Each person to whom a license is issued hereunder shall pay to the City of Redding for each period of three months a license fee in the sum of $5.00. . . .

"Section 11. This ordinance is hereby declared to be enacted in the exercise of the police power of the City of Redding and if any section, sentence, clause, or phrase of this ordinance shall be declared invalid, such declaration shall not affect the validity of the remaining portions of this ordinance. The city council [although, as above noted, this is an initiative measure] hereby declares that it would have passed this ordinance and each section, sentence, clause and phrase thereof irrespective of the fact that any one or more sections, sentences, clauses or phrases is declared unconstitutional or otherwise invalid."

Porterfield, sometimes referred to herein as petitioner, is the business representative of the Construction and General Laborers Union, Local No. 961. A part of his duties is to solicit memberships. He receives a salary for performing his duties. On March 10, 1942, he solicited, in Redding, a man by the name of Shaw to join Local 961. He told Shaw that he had a job for him if he became a member of Local 961; that the initiation fee for joining would be $25, and dues thereafter would be $1.50 per month. Shaw did not join.

On March 16, 1942, a conversation took place between

petitioner and Harold F. Riley, License Collector in the City of Redding. Clarence E. Todd, petitioner's attorney, and Glenn D. Newton, City Attorney of Redding, were also present. Riley asked petitioner to make application for a license for soliciting memberships in organizations and demanded that he pay the sum of $5 for the license fee, but petitioner, on the advice of counsel, refused to do either. On that same day, a complaint was filed in the City Court of Redding charging petitioner with violations of sections 2, 4 and 7 of Ordinance No. 251, namely, with soliciting for compensation, without first having a license so to do, memberships in an organization requiring the payment of dues by its members; with failure to apply for a license although engaging in the described work; and with failure to pay the license fee of $5 per quarter. Petitioner was tried and convicted on all three counts. Upon appeal to the Superior Court in Shasta County, the judgment was affirmed. Petitioner thereafter applied to the District Court of Appeal (Third Appellate District) for a writ of habeas corpus on the ground that the ordinance was unconstitutional. That court denied the writ, Mr. Justice Peek dissenting (*In re Porterfield* (1944), 63 Cal.App.2d 518 [147 P.2d 15]). Petitioner now seeks a writ of habeas corpus from this court. The conclusions we have reached make it necessary to disapprove the holding of the District Court of Appeal insofar as it is inconsistent herewith.

Petitioner and the several amici curiae who have filed briefs in his support attack the Redding ordinance with many shafts. Foremost among the contentions are the following: (1) That petitioner does not fall within the terms of the ordinance; (2) that the right to solicit members in a lawful organization is an exercise of the constitutional right of free speech and not subject to regulation through the police power; (3) that the ordinance is invalid for the reason that it reposes uncontrolled discretion in the city council to grant or deny constitutional rights; (4) that the ordinance is vague and uncertain in its application in that it provides a standard pursuant to which a license may be denied an applicant because of prior or anticipated conduct on his part that may be clearly lawful; (5) that the ordinance is in conflict with the National Labor Relations Act; (6) that the ordinance conflicts with general laws of the State of California.

## The Remedy

■ Habeas corpus is a proper vehicle for invoking the decision of this court upon the constitutionality of the ordinance and the validity of petitioner's restraint. (*In re Bell* (1942), 19 Cal.2d 488, 492-495 [122 P.2d 22]; *In re Mark* (1936), 6 Cal.2d 516 [58 P.2d 913]; *Ex parte Keeney* (1890), 84 Cal. 304 [24 P. 34]; 13 Cal.Jur. 225-227, § 8.) ■ It is not, however, the equivalent of an appeal (*In re Connor* (1940), 16 Cal.2d 701, 705 [108 P.2d 10]; see *Bowen* v. *Johnston* (1939), 306 U.S. 19, 26-27 [59 S.Ct. 442, 83 L.Ed. 455]; *Ex parte Drew* (1922), 188 Cal. 717, 720 [207 P. 249]; *Ex parte Sternes* (1888), 77 Cal. 156, 161 [19 P. 275, 11 Am. St.Rep. 251]) and the proceeding may not be used as a device for the correction of mere errors or irregularities committed within the exercise of an admitted jurisdiction (see *In re Wood* (1924), 194 Cal. 49, 62 [227 P. 908]).

## Scope of Application of the Ordinance

■ We are satisfied that the ordinance, at least in this proceeding, is not vulnerable to attack on the ground of uncertainty as to who is required to obtain a license. We are in accord with the construction attributed to section 2 of the ordinance by the trial court. We think that the plain meaning of the language of that section is that every person who for pay solicits members in an organization as therein designated is purportedly required to apply for a license, whether he is compensated with a stipulated sum for each member secured, or is paid a salary for services including his duty to solicit memberships. In either event he is receiving "compensation" for his services. The fact, pointed to by petitioner, that the only license issued under the ordinance, during the first four years following its enactment, was to an individual whose compensation was based upon the number of memberships sold, is not of such controlling importance as to establish a contrary construction by the enforcement officer or to justify one by us.

## Police Power of Municipality to Regulate and Tax Business

■ It is a general and well-established rule that where a profession or occupation is one of which it can be fairly said that those pursuing it should have particular qualifications, it is within the power, and ordinarily is the duty, of the Legis-

lature or other law-enacting body to exact reasonable assurances of those pursuing the profession or occupation that they do possess such qualifications. (*Riley* v. *Chambers* (1919), 181 Cal. 589, 593 [185 P. 855, 8 A.L.R. 418]; *Binford* v. *Boyd* (1918), 178 Cal. 458, 461-463 [174 P. 56]; *People* v. *Ratledge* (1916), 172 Cal. 401, 405 [156 P. 455]; *In re Stork* (1914), 167 Cal. 294, 295 [139 P. 684]; *Ex parte Whitley* (1904), 144 Cal. 167, 172 [77 P. 879, 1 Ann.Cas. 13]; *In re Carlson* (1927), 87 Cal.App. 584, 587-588 [262 P. 792].) There can scarcely be doubt that one who for compensation and as a part of his regular duties solicits or obtains memberships in an organization requiring dues of its members is engaging in a professional or business pursuit. He normally does so for business reasons, exclusively or materially. One who joins such an organization at the instance of the solicitation thereby assumes a financial liability to the organization and ordinarily expects to receive some value or benefit from his membership. ■ The mere fact that labor unions are treated in the Labor Code and professions in general by the Business and Professions Code does not mean that the act of an employe of a labor union in soliciting workers to become members of a particular union does not constitute engaging in an occupation or business subject to license for purposes of regulation or revenue. Labor unions exist for very practical business as well as social reasons. The code separation is for convenience only. ■ It is a well-recognized rule that for purposes of statutory construction the codes are to be regarded as blending into each other and constituting but a single statute. (*Proctor* v. *Justice's Court* (1940), 209 Cal. 39, 43 [285 P. 213]; *County of Butte* v. *Merrill* (1903), 141 Cal. 396, 399 [74 P. 1036]; *Clarke* v. *Mead* (1894), 102 Cal. 516, 520 [36 P. 862].)

■ Petitioner undoubtedly has a constitutional right to speak with or to others, privately or in public, of the merits of labor organization. He contends that the constitutional guaranty secures to him the right to engage, wholly unregulated, in the business of membership solicitation for his principal because, he asserts, his solicitation amounts only to an exercise of speech, i. e., the imparting of information, the conveyance of ideas and persuasion. The same may be said of the speech of a stock or real estate salesman, of an itinerant peddler, or of a country club promoter. It is not

contended that such last mentioned pursuits cannot be regulated. Hence petitioner cannot stop on the abstract right of speech; he must go further and depend on the object sought to be accomplished by the speech. That is, he must show the real character of the activity. If his speech, by way of examples, relates only to social or economic theories or to governmental issues he may not be placed under prior restraint unless clear, present, and grave danger to the public requires this. A person without a license may speak privately or in public on the social and economic advantages of home owning in a particular area. The dissemination of his ideas may persuade persons to make purchase offers. But he cannot without being subject to the sanction of the law (Bus. & Prof. Code, §§ 10130, 10134 [Real Estate Law]) engage in such activities for compensation. Porterfield was exercising the faculty of speech not merely to convey ideas but for compensation to sell a membership in his organization; a membership which, it was contemplated, would have a utilitarian value to the person solicited as well as to the labor movement.

■ A municipality may impose reasonable conditions upon the conduct of a business. ■ The right of free speech protected by the federal and state constitutional guaranties is not an absolute right which carries with it into businesses and professions total immunity from regulation in the performance of acts as to which speech is a mere incident or means of accomplishment. It was not intended that a right to speak for the purpose of profit may be created to the derogation of the police power of state or city. ■ The main purpose of such constitutional provisions was to prevent previous restraint upon (as had been imposed by other governments and in early times in this country), or the stifling of efforts pointing toward, enlightenment of individuals upon or concerning their rights and beliefs and the duties of their rulers. (See *Patterson* v. *Colorado* (1907), 205 U.S. 454, 462 [27 S.Ct. 556, 51 L.Ed. 879]; *Commonwealth* v. *Blanding* (1825), 3 Pick. (Mass.) 304, 313-314 [15 Am.Dec. 214].) The freedom of speech and of the press protected by the constitutional guaranties includes in the main, it has been said, freedom of expressions on political, sociological, religious, and economic subjects, not commercial activities to which speech is only an incident or means. (*Valentine* v. *Chrestensen* (1942), 316 U.S. 52, 54-55 [62 S.Ct. 920, 86 L.Ed. 1262]; see *Packer Corp.* v. *Utah* (1932), 285 U.S. 105 [52 S.Ct. 273, 76 L.Ed 643]; *Fifth*

*Avenue Coach Co.* v. *New York City* (1911), 211 U.S. 467 [31 S.Ct. 709, 55 L.Ed. 815] ; *San Francisco Shopping News Co.* v. *City of South San Francisco* (1934, 9 Cir.), 69 F.2d 879 ; *Sieroty* v. *City of Huntington Park* (1931), 111 Cal.App. 377 [295 P. 564] ; *Pittsford* v. *City of Los Angeles* (1942), 50 Cal.App.2d 25, 31-33 [122 P.2d 535] ; *People* v. *St. John* (1930), 108 Cal.App.Supp. 779 [238 P. 53].) ▉ However, as pointed out in the recent case of *Thomas* v. *Collins* (1945), 323 U.S. 516 [65 S.Ct. 315, 323, 89 L.Ed. 430], the right of free speech has not been confined to any field of human interest and it cannot be said that the safeguards of the First Amendment (or the Fourteenth as it incorporates the First) are wholly inapplicable to business or economic activity. (Cf. *Schneider* v. *State* (1939), 308 U.S. 147 [60 S.Ct. 146, 84 L.Ed. 155].) ▉ In the last analysis the extent of permissible regulation of business or economic activity depends upon the balancing of social interests and the facts of any given case. (Cf. Jackson, J., concurring in *Thomas* v. *Collins* (1945), *supra.*)

▉ The need for such legislation is primarily to be decided by those who enact it. A very wide discretion as to what is needful or proper for the purpose is necessarily committed to the legislative body. (*Ex parte Tuttle* (1891), 91 Cal.589, 591 [27 P. 933] ; *In re McNeal* (1939), 32 Cal.App.2d 391, 395-396 [89 P.2d 1096].) ▉ But because the rights of citizens both to free speech and to engage in a business or follow a profession are constitutionally protected (see U. S. Const., 14th Amend.; Cal. Const. art. I, §§ 1, 3, 9, 13; *Gitlow* v. *New York* (1925), 268 U.S. 652, 666 [45 S.Ct. 625, 69 L.Ed 1138] ; *Stromberg* v. *California* (1931), 283 U.S. 359, 368 [51 S.Ct. 532, 75 L.Ed. 1117] ; *DeJonge* v. *Oregon* (1937), 299 U.S. 353, 364 [57 S.Ct. 255, 81 L.Ed. 278, 283] ; *Suckow* v. *Alderson* (1920), 182 Cal. 247, 249-250 [187 P. 965] ; *Pasadena Ice Co.* v. *Reeder* (1929), 206 Cal. 697, 703-704 [275 P. 944, 276 P. 995] ; *Continental Car-Na-Var Corp.* v. *Moseley* (1944), 24 Cal.2d 104, 110 [148 P.2d 9]), it is always a judicial question whether any particular regulation of such rights is a valid exercise of legislative powers. (See *Ex parte Whitwell* (1893), 98 Cal. 73, 78-80 [32 P. 870, 35 Am.St.Rep. 152, 19 L.R.A. 727] ; *Ex parte Drexel* (1905), 147 Cal. 763, 766 [82 P. 429, 3 Ann.Cas. 878, 2 L.R.A. N.S. 588] ; *In re Miller* (1912), 162 Cal. 687, 694 [124 P. 427] ; *Ex parte Dickey* (1904), 144 Cal. 234 [77 P. 924, 103 Am.St. Rep. 82, 1 Ann.Cas. 428, 66 L.R.A. 928] ; *Frost* v. *City of Los Angeles* (1919), 181 Cal. 22 [183 P. 342, 6 A.L.R. 468].)

 We unequivocally recognize and affirm that it is the duty of courts to be most vigilant and vigorous in protecting individuals, as well as minority and majority groups, against encroachment upon their fundamental liberties. Those freedoms are vastly more consequential than any object to be attained by business or professional regulations and the integrity of the former is not to be compromised to save the latter. It is a general rule, also, that the power of the courts, from its very nature, must be exercised with the utmost caution. Laws are enacted by and for the people. The people have a right of experimentation, of evolution through trial and error. Constitutionality of purpose and application is generally to be presumed. It has often been said that it is only when it clearly appears that an ordinance or statute passes definitely beyond the limits which bound the police power and infringes upon rights secured by the fundamental law, that it should be declared void. (*Ex parte Whitwell* (1893), *supra,* 98 Cal. 73, 79; *Laurel Hill Cemetery* v. *City and County of San Francisco* (1907), 152 Cal. 464, 471 [93 P. 70, 14 Ann.Cas. 1080, 27 L.R.A.N.S. 260]; *Ex parte Quong Wo* (1911), 161 Cal. 220, 230 [118 P. 714]; *Ex parte Hadacheck* (1913), 165 Cal. 416, 419 [132 P. 584, L.R.A. 1916B 1248].)

 The choice, then, which the courts must make—"to say where the individual's freedom ends and the State's power begins"—is a delicate one. "Choice on that border, now as always delicate, is perhaps more so where the usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment. . . . That priority gives these liberties a sanctity and a sanction not permitting dubious intrusions. And it is the character of the right, not of the limitation, which determines what standard governs the choice. . . . For these reasons any attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger." (*Thomas* v. *Collins* (1945), *supra,* 65 S.Ct. 315, 322-323.) Here, however, it seems to us that the character of the right which is immediately regulated is, as previously indicated, that of engaging in a business or profession rather than of speech or assembly. Were it not for the direct application by the Supreme Court of the constitutional speech and assembly guaranties to the facts of the Thomas case (hereinafter dis-

cussed in more detail) there would seem to be little basis for arguing that the solicitation by Porterfield for compensation was not a business act subject to police regulation.

The matter dealt with, solicitation, may be a vehicle for deception or fraudulent imposition. Also, it is a matter of common knowledge that among labor organizations there exist a sedulous interest and a high zeal in the matter of obtaining new members not only in general but as against other and competing unions with conflicting interests. Such organizations have had a rapid growth in recent years and have developed to the stage where it has become virtually necessary for most employes in the larger industries, not already members, to affiliate with one group or another in order to secure or preserve employment. Union members are required to contribute in the aggregate large sums of money in the form of dues to the unions, which depend thereon for support. In addition, new members are generally charged substantial initiation fees. The question of whether or not a given individual should join a particular union or local thereof is a matter that vitally affects his livelihood and is usually not lightly considered. It is of importance to the individual and to the community as well as to the interests of the union itself, that the representatives entrusted with soliciting memberships be reputable persons who will not misrepresent the facts, whose promises can be depended upon, and who will carry on their work in an orderly manner having due respect to other representatives canvassing the same field. Since such representatives in acting for others occupy a capacity more or less fiduciary in character, there is particularly required of them for the proper discharge of their duties certain attributes, such as honesty and truthfulness, which go to make up good moral character. (Cf. *Riley* v. *Chambers* (1919), *supra,* 181 Cal. 589, 594.)

### Laws Governing Freedom of Speech or of Business as Controlling the Limits of Regulation

 The foregoing considerations, plus the fact that in the instant case the only restriction upon speech (other than that involved in the standards prescribed for issuance of the license, hereinafter discussed) is that which is incidental as a part of the regulation of paid solicitation, suggest the conclusion that the constitutional principle of free speech does not render wholly immune from reasonable regulation the profes-

sion or business of solicitation in which petitioner is engaged. To a varying extent solicitation of memberships in a labor organization may incidentally involve some discussion of questions of a social or economic nature not ordinarily involved in the conduct of most other professions. ▪ The right to inform the public concerning and to discuss the asserted virtues and faults of employers, of working conditions, and of union objects, and the advantages and disadvantages of membership in any particular union, is protected as an incident of free speech and free assembly. (See *Hague* v. *C.I.O.* (1939), 307 U.S. 496, 512-513 [59 S.Ct. 954, 83 L.Ed. 1423].) However, the ordinance under discussion, insofar as it has been applied to petitioner, is directly regulative only of the acts of soliciting and of obtaining of dues-paying memberships for compensation. Only through that regulation, and as an incident thereof, has it affected the expression of views, dissemination of information, laudation, or any other kind of speech activity by petitioner. (Its tax feature, and the validity of the licensing standards it ordains, entirely different questions, are discussed later herein. Also, it must be noted in this connection, that we are not now concerned with any direct application of section 1 as prohibiting strikes, picketing, or other concerted activity.)

Petitioner, however, strongly relies upon *Thomas* v. *Collins* (1945), *supra*, 323 U.S. 516 [65 S.Ct. 315, 89 L.Ed. 430], as establishing the proposition that the solicitation by a labor organizer, whether with or without compensation as such, of memberships in a labor union is but an exercise of the freedom of speech and is not subject to any prior regulation or restraint except under the clear and present danger rule. That case, it must be recognized, presents a factual basis of such similarity as to make it difficult upon reason to distinguish. There a Texas statute required each labor union organizer to secure an organizer's identification card from the Secretary of State before soliciting members for his organization. The Texas statute is not a licensing or revenue act. It is a mere registration statute purportedly applicable to all labor organizers. It provides that " 'labor organizer' shall mean any person who for a pecuniary or financial consideration solicits memberships in a labor union or members for a labor union." (§ 2(c) of House Bill No. 100, ch. 104, Gen. and Sp. Laws of Texas, Reg. Sess., 48th Legis. 1943 [Vernon's Ann. Tex. Civ. St. art. 5154 a].) Section 5 of the same statute ordains that

"All labor union organizers operating in the State of Texas shall be required to file with the Secretary of State, before soliciting any members for his organization, a written request by United States mail, or shall apply in person for an organizer's card, stating (a) his name in full; (b) his labor union affiliations, if any; (c) describing his credentials and attaching thereto a copy thereof, which application shall be signed by him. Upon such applications being filed, the Secretary of State shall issue to the applicant a card on which shall appear the following: (1) the applicant's name; (2) his union affiliation; (3) a space for his personal signature; (4) a designation, 'labor organizer'; and, (5) the signature of the Secretary of State, dated and attested by his seal of office. Such organizer shall at all times, when soliciting members, carry such card, and shall exhibit the same when requested to do so by a person being so solicited for membership."

It will be noted that the card-issuing official is given no discretion in the matter. He is bound to issue the card as of course upon application. No fee is charged. Showing the similarity of the arguments made in support of the Texas law to those advanced in favor of the far more rigorous Redding ordinance is the following language of the Supreme Court of Texas (*Ex Parte Thomas* (1943), 141 Tex. 591, 596 [174 S.W.2d 958]): "A careful reading of the section of the law here under consideration will disclose that it does not interfere with the right of the individual lay members of unions to solicit others to join their organization. It does not affect them at all. It applies only to those organizers who for a pecuniary or financial consideration solicit such membership. It affects only the right of one to engage in the business as a paid organizer, and not the mere right of an individual to express his views on the merits of the union. Furthermore, it will be noted that the Act does not require a paid organizer to secure a license, but merely requires him to register and identify himself and the union for which he proposes to operate before being permitted to solicit members for such union. The Act confers no unbridled discretion on the Secretary of State to grant or withhold a registration card at his will, but makes it his mandatory duty to accept the registration and issue the card to all who come within the provisions of the Act upon their good-faith compliance therewith."

Differing in one particular (not material to the decision, apparently) from the Redding ordinance the Texas statute expressly provided that an injunction might issue to restrain

acts in violation of the statute. It also made violation a misdemeanor. No point was made of the injunctive feature. It was contended that "the constitutional vice lay in the prohibition of the statute and that vice would preclude arrest and conviction for violation, no less than injunction against the denounced activity." (*Thomas* v. *Collins, supra,* 65 S.Ct. at p. 332.)

Thomas advertised that he intended making a speech soliciting memberships in a local union affiliated with the international union by which he was employed. He did not register or apply for an identification card. An injunction was issued and served. By its terms it forbade "soliciting membership in Local Union No. 1002 . . . [or] memberships in any other labor union" without first obtaining a card. It did not forbid holding a meeting or making a speech, as such. Thomas still did not register or apply for a card. The advertised meeting was held and Thomas particularly solicited one Pat O'Sullivan and, in general, an audience of some three hundred persons to join the local union. Both contempt and criminal proceedings were instituted against Thomas. He was adjudged guilty of contempt and sentenced. On his application for a writ of habeas corpus the Supreme Court of Texas, as previously indicated, upheld the statute and the sentence. (*Ex parte Thomas* (1943), *supra,* 141 Tex. 591 [174 S.W.2d 958].) On appeal the Supreme Court of the United States declared (p. 323 of 65 S.Ct.), "The grievances for redress of which the right of petition was insured, and with it the right of assembly, are not solely religious or political ones. And the rights of free speech and a free press are not confined to any field of human interest.

"The idea is not sound therefore that the First Amendment's safeguards are wholly inapplicable to business or economic activity. And it does not resolve where the line shall be drawn in a particular case merely to urge, as Texas does, that an organization for which the rights of free speech and free assembly are claimed is one 'engaged in business activities' or that the individual who leads it in exercising these rights receives compensation for doing so. Nor, on the other hand, is the answer given, whether what is done is an exercise of those rights and the restriction a forbidden impairment, by ignoring the organization's economic function, because those interests of workingmen are involved or because they have the general liberties of the citizen, as appellant would do.

"These comparisons are at once too simple, too general, and too inaccurate to be determinative. Where the line shall be placed in a particular application rests, not on such generalities, but on the concrete clash of particular interests and the community's relative evaluation both of them and of how the one will be affected by the specific restriction, the other by its absence. That judgment in the first instance is for the legislative body. But in our system where the line can constitutionally be placed presents a question this Court cannot escape answering independently, whatever the legislative judgment, in the light of our constitutional tradition. *Schneider* v. *State of New Jersey*, 308 U.S. 147, 161, 60 S.Ct. 146, 150, 84 L.Ed. 155. And the answer, under that tradition, can be affirmative, to support an intrusion upon this domain, only if grave and impending public danger requires this . . . [P. 324 of 65 S.Ct.] Thomas went to Texas for one purpose and one only—to make the speech in question. *Its whole object was publicly to proclaim the advantages of workers' organization and to persuade workmen to join Local No. 1002 as part of a campaign for members. These also were the sole objects of the meeting.* The campaign, and the meeting, were incidents of an impending election for collective bargaining agent, previously ordered by national authority pursuant to the guaranties of national law. *Those guaranties include the workers' right to organize freely for collective bargaining. And this comprehends whatever may be appropriate and lawful to accomplish and maintain such organization.* It included, in this case, the right to designate Local No. 1002 or any other union or agency as the employees' representative. It included their right fully and freely to discuss and be informed concerning this choice, *privately or in public assembly. Necessarily correlative was the right of the union, its members and officials* [this would seem obviously to include paid organizers], *whether residents or nonresidents of Texas and, if the latter, whether there for a single occasion or sojourning longer, to discuss with and inform the employes concerning matters involved in their choice. These rights of assembly and discussion are protected by the First Amendment.* Whatever would restrict them, without sufficient occasion, would infringe its safeguards. The occasion [obviously, solicitation of memberships] was clearly protected. The speech was an essential part of the occasion, un-

less all meaning and purpose were to be taken from it. And the invitations, both general and particular, were parts of the speech, inseparable incidents of the occasion and of all that was said or done. . . . [P. 326 of 65 S.Ct.] The First Amendment is a charter for government, not for an institution of learning. *'Free trade in ideas' means free trade in the opportunity to persuade to action,* not merely to describe facts. [Citations.] Indeed, the whole history of the problem shows it is to the end of preventing action that repression is primarily directed and to preserving the right to urge it that the protections are given.

"Accordingly, decision here has recognized that employers' attempts to persuade to action with respect to joining or not joining unions are within the First Amendment's guaranty. . . . [P. 327 of 65 S.Ct.] If what Thomas did, in soliciting Pat O'Sullivan, was subject to such a restriction, as to which we express no opinion, that act was intertwined with the speech and the general invitation in the penalty which was imposed for violating the restraining order. Since the penalty must be taken to have rested as much on the speech and the general invitation as on the specific one, and the former clearly were immune, the judgment cannot stand." (Italics added.)

Thus it appears that the majority of the Supreme Court avowedly left open the question as to whether a personal solicitation of one person would be unlawful (subject to regulation) while holding that the same solicitation addressed to three hundred persons was lawful (not subject to regulation or any prior restraint, even registration for identification). Of course, Thomas was at least equally carrying on his business of soliciting members for compensation when he addressed three hundred persons as when he addressed one. It would seem that he was more efficiently carrying on his business when addressing three hundred than he would have been by addressing one and that the need for whatever protection the statute afforded the public was correspondingly greater in respect to the larger number. There scarcely seems to be magic in the number three hundred. If the number had been one hundred or fifty or ten, would not the result have been the same? And if ten persons could lawfully assemble to hear a speech or solicitation could not two do the

same thing? If the speaker may lawfully solicit two persons to join a union may he not solicit one?

The Redding ordinance by its express terms would apply to the facts of the Thomas case. Section 2 makes it "unlawful for any person, inside of the city limits of the City of Redding, to solicit . . . membership for compensation in any organization which requires the payment of dues by such members without first having procured a license to do so, as in this ordinance provided." Thomas received compensation for soliciting memberships in his own and affiliated unions. The "whole object" of his speech was to solicit memberships. If it had been made in Redding he clearly would have been subject to prosecution under the ordinance if he had not first paid the tax and secured the license. Regardless, however, of whether a distinction of constitutional substance can be made between the occasion of the Thomas public solicitation of three hundred persons and the Porterfield private solicitation of one person, there are elements of the Redding ordinance, not present in the Texas statute, which compel us to hold such ordinance invalid.

### Arbitrary Prohibition of Lawful Acts

Petitioner contends that section 6 of the ordinance is invalid because it provides for a vague and uncertain subjective test whereby the city council may exercise substantially unrestricted authority to arbitrarily grant or deny licenses. In American Law Reports, Annotated (vol. 12, p. 1436), the general rule on this subject is well stated. "[A] statute or ordinance which vests arbitrary discretion with respect to an ordinarily lawful business . . . in public officials, without prescribing a uniform rule of action, or, in other words, which authorizes the issuing or withholding of licenses . . . according as the designated officials arbitrarily choose, without reference to all of the class to which the statute or ordinance under consideration was intended to apply, and without being controlled or guided by any definite rule or specified conditions to which all similarly situated might knowingly conform,—is unconstitutional and void." (See, also, 54 A.L.R. 1104; 92 A.L.R. 400.) It is recognized that there is a considerable diversity of conclusion and some inconsistency in the applications of the tests. The annotator (p. 1435 of 12 A.L.R.) says "In the main, it may be said

that the validity of the grant of discretion depends largely upon the nature of the business . . . with respect to which it is to be exercised, and as to whether or not the proper regulation and control thereof require that a discretion be vested in one or more public officials in order properly to control the conduct of the business . . .'' (As previously indicated, we assume for the purposes of this discussion, without deciding, that the solicitation of memberships in a labor union is a business which may properly be subjected to some police regulation.)

In the first place in this connection it is to be noted that section 4 of the ordinance requires that application for a license be made in writing "upon such forms as may be provided by said city council, a copy of which shall at all times be attached to said license.'' The ordinance is utterly silent as to what the content of the forms shall be. Section 6 provides that at the hearing to be held by the council on each application for a license, evidence shall be received of the good moral character of the applicant and whether or not he is likely to resort to force, violence, threat, menace, coercion, intimidation or corrupt means in his proposed work of solicitation. "If the city council is satisfied that said applicant is of good moral character and will not resort to force, violence, threat, menace, coercion, intimidation or corrupt means in his proposed work of solicitation, it shall direct the issuance of a license to said applicant for said purpose of solicitation upon payment of the license fee herein provided for.''

We are of the opinion that on the face of the ordinance the indefinite standards which it enunciates provide a mechanism for the deprival of constitutional rights, not only on the basis of the guaranties applicable to free speech but also on the basis of those protecting the right to engage in lawful fashion in a lawful activity. It is pointed out by petitioner that the council members in the exercise of their power might very conceivably conclude that because of an applicant's labor union affiliations or because of his attitude upon controversial labor issues he did not have the prescribed qualities. It is entirely possible that on occasion a majority of the council might be members of a rival labor union or they might be employers engaged in a controversy with the union represented by the applicant. Certainly the standard provided by section 6 of the Redding ordinance is entirely subjective.

Each council member is left to determine in his own mind what is "likely" to be the future conduct of the applicant. The character or extent of showing necessary to satisfy the council that the applicant is of good moral character and will not resort to the activities mentioned is not set forth. Satisfaction may be circumscribed by individual whim, caprice, or personal prejudice.

Respondent maintains that the ordinance may be sustained if we indulge in a presumption that the council will perform its duty in a fair and impartial manner. (See *People* v. *Globe Grain & Milling Co.* (1930), 211 Cal. 121, 126-128 [294 P. 3]; *In re Flaherty* (1895), 105 Cal. 558, 562 [38 P. 981, 27 L.R.A. 529]; 19 Cal.L.Rev. 449.) This contention rests upon the assumption that no question of, or akin to that of, free speech is presented, for where free speech or any other fundamental right is involved the presumption of proper action by the licensing authority cannot be relied upon. Numerous recent decisions from the United States Supreme Court have struck down ordinances which attempted to vest city officials with virtually unlimited discretionary power to grant or refuse permits and to thereby effectively impose a censorship or previous restraint upon constitutional rights or liberties. (See *Lovell* v. *Griffin* (1938), 303 U.S. 444 [58 S.Ct. 666, 82 L.Ed. 949]; *Hague* v. *C.I.O.* (1939), *supra,* 307 U.S. 496; *Schneider* v. *State* (1939), *supra,* 308 U.S. 147; *Cantwell* v. *Connecticut* (1940), *supra,* 310 U.S. 296 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352]; *Largent* v. *Texas* (1943), 318 U.S. 418 [63 S.Ct. 667, 87 L.Ed. 873].) As shown in some detail later in this opinion, in at least one aspect of the instant case, the element of free speech cannot be ignored. (See discussion in immediately following paragraphs of requirement of the ordinance that organizers and unions forego the right to resort to concerted activities amounting to or producing "menace, threat, intimidation, coercion" and see previously quoted language of the main opinion in *Thomas* v. *Collins* (1945), *supra,* 323 U.S. 516 [65 S.Ct. 315, 323, 89 L.Ed. 430].) Furthermore this case presents the question as to whether a special act (the Redding ordinance) has validity in view of the general state law (Lab. Code, § 923). In discussing the presumptions of validity which ordinarily support legislation this court has said that "these presumptions . . . are proper in a case where the right to legislate both

generally and specially upon a subject exists but are inapplicable to a case like the present where we are testing the question as to whether or not there is room for the operation of a special act in view of the existing general law." (*Ventura County Harbor Dist.* v. *Board of Supervisors* (1930), 211 Cal. 271, 280 [295 P. 6].)

But even if we indulge to its fullest extent the presumption urged by respondent the ordinance remains void on its face because by necessary implication it directs the city council to deny a license unless the council "is satisfied that said applicant . . . will not resort to . . . threat, menace, coercion, intimidation . . . in his proposed work of solicitation," means to which, as expressed or applied through strikes, picketing, or other lawful concerted action of union members, an applicant has a constitutionally protected right to resort.

That portion of section 6 which requires a determination by the council, before a license may be directed to issue, that the applicant will not resort to such means in his proposed work, appears to be complementary in purpose to section 1 of the ordinance, which provides that "It shall be unlawful for any person, firm or corporation, whether as principal, clerk, servant, agent, or employee, inside of the city limits of the City of Redding, by force, violence, menaces, threat, intimidation, coercion or corrupt means, either directly or indirectly, to seek, solicit, induce, or attempt to seek, solicit or induce, any person to join or take membership in any organization, or by force, violence, threat, intimidation, coercion or corrupt means, either directly or indirectly, to seek, solicit or induce, or attempt to seek, solicit or induce, any employer or other person to compel or induce any employee or any other person to join or take membership in any organization." This section seems to be directly aimed at prohibiting strikes, picketing and concerted action generally, and proscribes lawful as well as unlawful manifestations and applications of such activities. It is reasonably supposed that the "proposed work of solicitation," referred to in section 6 of the ordinance, includes the direct or indirect employe and employer solicitation referred to in section 1. It is too firmly established to merit much more than the mere enunciation of the fact that not all conduct embracing or effecting compulsion, coercion, intimidation, threats, and menace is unlawful. The means employed and the object to be attained may be entirely lawful, moral and just, even though the conduct has effected such

incidental results and has attained its objective through them.

Perhaps the largest number of organizations of any particular type which appear to fall within the terms of the Redding ordinance are labor organizations. It is with the rights of such an organization and its employe that we are here directly concerned. Particularly in the fields of labor union controversies with employers and in competition among the unions themselves has it been recognized that physically peaceable compulsion, coercion, intimidation, and threats may go to make up lawful moral and social pressure as against both employers and nonmember employes. (See *Parkinson Co.* v. *Building Trades Council* (1908), 154 Cal. 581 [98 P. 1027, 16 Ann.Cas. 1165, 21 L.R.A.N.S. 550]; *McKay* v. *Retail Automobile Salesmen's Local Union No. 1067* (1940), 16 Cal.2d 311, 320-321 [106 P.2d 373]; *In re Bell* (1942), 19 Cal.2d 488, 497 [122 P.2d 22].) ▮ Various means of economic suasion such as picketing, the primary and secondary boycotts, and refusal to work together, often go to make up concerted efforts to induce nonmember employes to join a particular union. Such conduct may be performed in the exercise of civil liberties, guaranteed by both our federal and state Constitutions. ▮ Furthermore, solicitation of memberships in a labor union, unlike most other organizations, does not end when a worker chooses one union in preference to another. Members of a union or group of affiliated unions are privileged to refuse to work on the same job with other workmen whether the latter have united or organized themselves into a separate trade union or have not done so. (*Parkinson* v. *Building Trades Council* (1908), *supra; McKay* v. *Retail Automobile Salesmen's Local Union No. 1067* (1940), *supra.*) ▮ It is now well established that a labor union may resort to concerted activities to win over employes with the object of gaining a closed shop agreement. (*Milk Wagon Drivers Union* v. *Meadowmoor Dairies, Inc.* (1941), 312 U.S. 287 [61 S.Ct. 552, 85 L.Ed. 836, 132 A.L.R. 1200]; *McKay* v. *Retail Automobile Salesmen's Local Union No. 1067* (1940), *supra; C. S. Smith Metropolitan Market Co.* v. *Lyons* (1940), 16 Cal.2d 389, 396 [106 P.2d 414]; *Fortenbury* v. *Superior Court* (1940), 16 Cal.2d 405 [106 P.2d 411]; *Sontag Chain Stores Co.* v. *Superior Court* (1941), 18 Cal.2d 92 [113 P.2d 689]; *Park & T. I. Corp.* v. *International etc. of Teamsters* (1946), 27 Cal.2d 599, 603, 604 [165 P.2d 891].) The National Labor Relations Act designates the closed shop as one of the

objectives of collective bargaining. It constitutes an unfair labor practice for an employer, governed by such act, to enter into a collective bargaining agreement with a unit not the representative of the majority of the employes. (N.L.R.A., § 8(3), 29 U.S.C.A., § 158(3).) And peaceful picketing and boycotting for a closed shop by an outside union are not enjoinable in a federal court under the Norris-LaGuardia Act. (See *Lauf* v. *E. G. Shinner & Co.* (1938), 303 U.S. 323 [58 S.Ct. 578, 82 L.Ed. 372].)

 If a paid organizer or solicitor has in the past been connected in any way with concerted activities carried on by his union against an employer or an employe group or, in the opinion of the board, is "likely" to participate in such activity in the future, he could (and apparently *should*) under the terms of the ordinance be denied a license. Indeed, to meet the standard required for a license, he would be bound to prove that he and his union (at his request or with his connivance) would not (i. e., would forego the right to) engage in strikes, picketing, or boycotts as means of procuring members. Inasmuch as such conduct is inherently entirely lawful the consequent deprivation of a license would be arbitrary and in derogation of the applicant's constitutional right to carry on a lawful business or professional activity. The fact that the use of force, violence, and fraud may be prohibited does not warrant sustaining the ordinance which also prohibits that which may not be prohibited. "Language prohibiting conduct that may be prohibited and conduct that may not affords no reasonably ascertainable standard of guilt and is therefore too uncertain and vague to be enforced. [Citation.] A conviction based upon such a statute cannot stand even though the acts of misconduct in the particular case could be validly prohibited by properly drafted legislation." (*In re Bell* (1942), *supra,* 19 Cal.2d 488, 496.)

### *Impropriety of Control by Municipality, through Taxation, of Right Declared by General State Law*

 There is still another element of the Redding ordinance which in and by itself necessitates the conclusion that petitioner is entitled to his discharge. The tax provisions of such ordinance require paid organizers or solicitors to pay a license tax as a condition precedent to the pursuit of their activities. Such provisions are not consistent with the public

policy of California as declared in section 923 of the California Labor Code. That section provides that "Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees. Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore it is necessary that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment. . . ." (See, also, *Shafer* v. *Registered Pharmacists Union* (1940), 16 Cal.2d 379, 382 [106 P.2d 403].)

Where a matter is of state-wide concern, local regulation upon the subject may be enforced only if it is not in conflict with the statutes of the state. (Cal.Const., art. XI, § 11; *Pipoly* v. *Benson* (1942), 20 Cal.2d 366, 370 [125 P.2d 482, 147 A.L.R. 515]; *In re Means* (1939), 14 Cal.2d 254, 260 [93 P.2d 105]; *In re Simmons* (1925), 71 Cal.App. 522, 528 [235 P. 1029].) Respondent concedes that the ordinance in question is both a regulatory and revenue measure. We think that because it is the latter as well as the former it is incompatible with the state legislation.

The imposing of a license tax upon the exercise of the privilege of membership solicitation places an impediment in the way of realization of the state's declared policy of "full freedom" for association and self-organization of workers. A part of the right of self-organization of employes is the right of reasonable solicitation of others to join their union. (*Republic Aviation Corp.* v. *National L. R. Board* (1945), 324 U.S. 793 [65 S.Ct. 982, 89 L.Ed 1372, 157 A.L.R. 1081].) The solicitation of members is one of the most important activities of a union. Such solicitation is to a union akin to what breathing is to a human being. It is axiomatic to say that without members a union cannot function. In the development and apposition of a trade union the paid organizer usually has the duty to widely and systematically solicit workers for membership. A tax on solicitation of memberships thus tends to smother the workers' united existence. A revenue tax could be

made so onerous as to proximately affect collective bargaining and the successful carrying on of concerted activities for other mutual aid or protection. The legitimate objective of the closed shop and consequent employer recognition can generally be obtained only by increase of membership and expansion of organization.

If the city of Redding may tax the privilege (or right) for revenue it may fix the rate of tax and thus control at will an activity in a field where the Legislature has declared that full freedom shall exist. "The power to tax the exercise of a privilege is the power to control or suppress its enjoyment." (*Murdock* v. *Pennsylvania* (1943), 319 U.S. 105, 112 [63 S.Ct. 870, 87 L.Ed. 1292, 146 A.L.R. 81].) Further, if the city of Redding may impose such a tax every other municipality in the state may impose a similar tax upon the same individual if he crosses its borders. It is common knowledge that many of the larger industrial plants in this state are so situated that they draw workers from as many as five or six or more cities. In order to carry on the work of solicitation successfully, so as to attain a united employe front in any such plant and at the same time observe the right of the employer to the full-time attention of his employes to his work (see *Midland Steel Products Co.* v. *National L. R. Board* (1940, 6 Cir.), 113 F.2d 800), it may be necessary that an organizer representing or soliciting workers employed in such plants spend part of his time in each city from which workers are drawn. Even though the tax imposed by one city might not be burdensome additional levies by others could readily become so.

We confine our decision for present purposes on this phase of the case to the narrow question we have before us, i. e., the validity of a flat license tax attempted to be imposed by a municipality upon the exercise of the right of membership solicitation by a labor organizer for his union. It is not a tax imposed by the same authority which has declared the state's policy of full freedom of association and self-organization for workers. It is not an income or other indirect tax related to the scope of the activities of the solicitor or the amount of his compensation. It is not imposed to defray expenses of regulation. It is, we think, in its relationship to the public policy of the state as declared in section 923 of the Labor Code, if not in its relationship to freedom

of speech, the type of tax recently condemned by the Supreme Court of the United States in *Murdock* v. *Pennsylvania* (1943), *supra,* 319 U.S. 105. The court there held it to be immaterial that the tax in the particular case did not actually suppress or control the activity concerned or that it was nondiscriminatory. It was pointed out that the very nature of the tax, conditioned upon the activities of distributing literature and soliciting people to purchase religious books and pamphlets, operated to restrain in advance constitutional liberties and inevitably tended to suppress their exercise. (See, also, *Jones* v. *Opelika* (1943), 319 U.S. 103 [63 S.Ct. 890, 87 L.Ed 1290].) Here, the license tax obviously operates to make conditional and to restrict the "full freedom" of self-organization which the state law declares and protects.

By section 10 of the ordinance violation of any of its provisions is made a misdemeanor and subjects an offender to a maximum penalty of imprisonment in the county jail for a period of three months and a fine of $300. It thus effectually prohibits a paid organizer who is unable to pay the prescribed license fee from functioning as such paid organizer.

Since the State of California has seen fit to declare a state policy of complete freedom in regard to the formation of labor organizations to the end that there may be collective action by workmen (Lab. Code, § 923; *C. S. Smith Metropolitan Market Co.* v. *Lyons* (1940), supra, 16 Cal.2d 389, 400) and because inevitably the licensing provision of the Redding ordinance restrains the freedom taxed, such ordinance must give way to the dominant state legislation. It is of no consequence in this respect that only those who solicit for compensation are required to pay a tax. Lay members of a labor union have a right to carry on their work of self-organization both through their personal efforts and through those of their paid organizers. The latter are, or at least should be, but the representatives of the former.

*Effect of National Labor Relations Act and of Section 923 of the Labor Code as Absolutely Precluding any Municipal Regulation of Labor Organizers Not Determined*

It is further contended that the Redding ordinance is wholly invalid (in its regulatory as well as taxing aspects) for the asserted reason that it creates a constitutionally prohibited conflict with the public policy and laws of the United States as exemplified by the National Labor Relations Act

(see *Hill* v. *Florida* (1945), 325 U.S. 538 [65 S.Ct. 1373, 89 L.Ed 1782]) ; also that it conflicts with the public policy of the State of California as exemplified by section 923 of the California Labor Code and is therefore rendered wholly nugatory under the principle that where a matter is of state-wide concern, local regulation upon the subject may not be imposed if it is in conflict with the statutes of the state. (See Cal.Const., art. XI, § 11; *Pipoly* v. *Benson* (1942), *supra,* 20 Cal.2d 366, 370; *In re Means* (1939), *supra,* 14 Cal.2d 254, 260; *In re Simmons* (1925), *supra,* 71 Cal.App. 522, 528.)

 The National Labor Relations Act applies only to activities which affect interstate commerce. (*Labor Board* v. *Jones & Laughlin Steel Corp.* (1937), 301 U.S. 1, 29-32 [57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352].) The act secures to workers who fall within it the rights of self-organization and "full freedom" in the selection of representatives of their own choosing for purposes of collective bargaining with employers. (National Labor Relations Act, 29 U.S.C.A. § 151; *Hill* v. *Florida* (1945), *supra; cf. National L.R. Board* v. *Fansteel Metallurgical Corp.* (1939), 306 U.S. 240, 255 [59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599]; *National L.R. Board* v. *Sands Manufacturing Co.* (1939), 306 U.S. 332 [59 S.Ct. 508, 83 L.Ed. 682].) The public policy evinced by section 923 of the Labor Code is likewise that of protecting collective bargaining. (*Shafer* v. *Registered Pharmacists Union* (1940), *supra,* 16 Cal.2d 379, 385.)

For the reason that the records in the City Court of Redding (and on appeal in the Superior Court of Shasta County) do not show that Porterfield acted as the bargaining representative of employes in industries which are subject to the National Labor Relations Act, we find it unnecessary to determine whether or not the Redding ordinance conflicts with such act. (See *Alabama State Federation of Labor* v. *McAdory* (1945), 325 U.S. 450 [65 S.Ct. 1384, 89 L.Ed. 1725, 1736].) Also, inasmuch as it appears that, for reasons already stated, petitioner is entitled to his discharge, we find it unnecessary to determine whether the regulatory features of the ordinance in question, standing alone, are or are not, in their application to labor organizers, so inconsistent with the declared state policy as to be, if otherwise valid, entirely beyond the sphere of permissible municipal legislation.

### Severability Clause Cannot Save Conviction Based on Entire Ordinance

Respondent city contends that the portions of the ordinance relating to payment of the license fee and to soliciting by force, violence, menace, threats, intimidation, coercion, or corrupt means, if objectionable, may be eliminated by virtue of the savings clause (§ 11). The provisions of the ordinance left after severance would then require a showing merely as to the good moral character of the applicant.

The potential severability of the ordinance, however, can have no effect upon the instant matter. As far as petitioner is concerned the existence of the statute as a whole was an operative fact. The consequences of its existence as such cannot be ignored. In order for petitioner to have secured a license he would have had to have complied with the terms of the ordinance as written. In *Smith* v. *Cahoon* (1931), 283 U.S. 553, 563-565 [51 S.Ct. 582, 75 L.Ed. 1264], a private carrier for hire was convicted of the charge of operating vehicles upon the highways without having obtained the certificate of public convenience and necessity and without having paid the tax required by a statute of the State of Florida. Upon habeas corpus defendant successfully contested the constitutionality of certain provisions of the statute as applied to private carriers. It was contended in support of the conviction, however, that a savings clause removed the infirmity of the statute. In denying the efficacy of the contention and holding that defendant was entitled to assert his constitutional right by virtue of the invalidity of the statute upon its face, the United States Supreme Court stated (p. 563 of 283 U.S.):
"The effect of this savings clause is merely that, if one provision is struck down as invalid others may stand. But until such separation has been accomplished by judicial decision, the statute remains with its inclusive purport, and those concerned in its application have no means of knowing definitely what eventually will be eliminated and what will be left."

It is ordered that petitioner be discharged.

Gibson, C. J., Carter, J., and Traynor, J., concurred.

SPENCE, J.—I concur in the judgment discharging petitioner. I am entirely in accord with the conclusion stated by Mr. Justice Schauer that "the portions of the ordinance,

purporting to establish the standards upon which the licensing board shall act, are, as enacted, arbitrarily prohibitive of certain of petitioner's constitutionally guaranteed rights''; and I am further in agreement with much that is said in the opinion in support of the conclusion. If it may be implied, however, from the extended discussion of the several points considered in the opinion, that there are obstacles, constitutional or otherwise, to any and every form of reasonable regulation by municipal authorities of the occupation in which petitioner is engaged, I am not prepared to join in any portions of the opinion which may carry such implication.

Edmonds, J., and Shenk, J., concurred.